CLINCHFIELD COAL COMPANY, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH COMMISSION, Respondent,

United Mine Workers of America, Intervenor.

No. 88–1873.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1989.

Decided Feb. 9, 1990.

Rehearing Denied April 12, 1990.

---

John T. Scott, III, with whom Timothy M. Biddle, Washington, D.C., was on the brief, for petitioner.

Mary Lu Jordan, for intervenor.

L. Joseph Ferrara, Federal Mine Safety and Health Review Com'n and Dennis D. Clark, Counsel, Dept. of Labor, Washington, D.C., entered appearances for respondent.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Federal Mine Safety and Health Review Commission has directed the petitioner, a coal mine operator, to pay one week's salary, plus interest, to employees idled by a government-ordered shutdown later tied to the operator's health and safety violations. We uphold the Commission's rulings on both liability and interest.

## A

Late in the evening of June 21, 1983, an explosion killed seven miners and injured three others at Clinchfield's McClure mine in Dickerson County, Virginia. At 3:42 a.m. on June 22, an inspector of the Department of Labor's Mine Safety and Health Administration ("MSHA") issued a "safety order" under § 103(k) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 813(k) (1982), restricting access to officials and others needed for investigation of the event. Eighteen minutes later, the same inspector issued a "withdrawal order" under § 107(a), 30 U.S.C. § 817(a), which authorizes shutdown of a mine upon discovery of an "imminent danger." MSHA terminated the § 107(a) order on July 18 and the § 103(k) order on August 8, 1983. The mine evidently then resumed full operations. In March 1984, after conducting an investigation, MSHA issued citations to Clinchfield under § 104(d)(1), 30 U.S.C. § 814(d)(1), for several safety violations that it found caused the explosion.

By that time the United Mine Workers had already filed a claim with the Commission under § 111 of the Act, seeking compensation for the idled miners. The third and controlling sentence of § 111 allows compensation of up to one-week's pay:

If a coal or other mine or area of such mine is closed by an order issued under § 104 [30 U.S.C. § 814] or § 107 [30 U.S.C. § 817] of this title *for a failure of the operator to comply with any mandatory health or safety standards,* all

miners who are *idled due to* such order shall be fully compensated after all interested parties are given an opportunity for a public hearing, which shall be expedited in such cases, and after such order is final, by the operator for lost time at their regular rates of pay for such time as the miners are idled by such closing, or for one week, whichever is the lesser.

30 U.S.C. § 821 (1982) (emphasis added). The Commission ruled in favor of the UMW, relying on its reasoning in a similar case decided the same day, *UMWA v. Westmoreland Coal Co.*, 8 FMSHRC 1317 (1986). It concluded that this "one-week" provision of § 111 may apply even where the § 107 order is not the sole cause of the mine's closing, so long as the order had a "concurrent" mine-closing effect ("like 'a second padlock on the door'"). Further, even where the § 107 order does not itself allege a safety violation, the Commission will award compensation if violations later cited by MSHA caused the imminent danger underlying the § 107 order. *UMWA v. Clinchfield Coal Co.*, 8 FMSHRC 1310 (1986). The parties stipulated the existence of the required causal relation between the violations and the shutdown, and the Commission reaffirmed its initial ruling in later ordering payment of a week's wages, plus interest. *UMWA v. Clinchfield Coal Co.*, 10 FMSHRC 1493 (1988). Clinchfield filed a timely appeal.

B

■ Clinchfield's first objection is that because the mine was initially closed with a § 103 order, the claimants cannot meet § 111's requirement that miners have been "idled due to" a § 104 or § 107 order. This contention we may dismiss out of hand. Except for the eighteen-minute interval separating MSHA action under the two sections, the miners were no less idled by the § 107 order than by the corresponding action under § 103. Perhaps the words could be taken to mean "idled *initially and exclusively* due to" a § 104 or § 107 order. But that is not what the statute says. It is at least ambiguous on the issue, and thus we must uphold the agency's decision so long as we find it a " 'reasonably defensi-

ble' construction[ ] of the Mine Act." *Emerald Mines Co. v. FMSHRC*, 863 F.2d 51, 53 (D.C.Cir.1988) (quoting *Simpson v. FMSHRC*, 842 F.2d 453, 458 (D.C.Cir. 1988)).

We have no trouble doing so here. No party has adduced any legislative history even arguably constraining the open-ended tenor of the statutory language. Although the contrary conclusion might be defensible, the Commission's ruling seems not only reasonable but in fact the better reading. Where fault is found with the mine operator, workers whose mines are shut under § 103(k) because a danger has already been partly realized (i.e., an accident has happened) should not be any less entitled to a week's pay than those kept home by a danger that is only "imminent" under § 107. But whenever MSHA uses § 103 to take immediate and full control of a mine in emergency circumstances, that is exactly what would result from Clinchfield's view. See *UMWA v. Westmoreland Coal Co.*, 8 FMSHRC 1317, 1326 & n. 4 (1986).

■ Clinchfield's second objection is that the § 111 claim must fail because the § 107 order itself specified no safety violation on the mine operator's part. This issue turns on the meaning of "issued ... *for a failure* of the operator to comply with any mandatory health or safety standards." 30 U.S.C. § 821 (emphasis added). The language itself does not settle the matter, as even Clinchfield seems to concede. See Clinchfield Brief 4 ("All it [the UMWA] offers ... is a dictionary definition of 'for' to mean 'because or by reason of; on account of.' This begs the issue, for the definition *can just as easily be read to mean* that the order must itself allege a violation.") (emphasis added). Nor has any party produced illuminating legislative history.

We can see nothing unreasonable in the Commission's reading of the word "for" to require one-week compensation where there is a "causal nexus" between a § 107(a) withdrawal order and a health or safety violation that is cited later. As with the concurrent causation issue, Clinch-

field's position would work odd results. Mine inspectors have the most difficulty in ascribing responsibility for a hazard where the "imminent danger" required by § 107 has already materialized in an accident. As the Secretary of Labor explained to the Commission as an amicus in this case:

> MSHA often cannot, and should not, specify the operator's violations on a withdrawal order issued immediately following a mine disaster. Most importantly, immediately after the disaster, it frequently is too dangerous for anybody to enter the mine to determine exactly what happened. Further, MSHA usually must devote its resources to rescuing miners and recovering the affected areas of the mine before it can even begin its accident investigation.

Labor Amicus Brief 13, Joint Appendix ("J.A.") 115. Requiring an initial § 107(a) order to specify violations would thus "penalize miners in just those cases where safety violations are so severe that they result in a disaster." *Id.* at 14, J.A. 116. Not only is the Secretary's argument reasonable, but the very fact of the Commission's acting in agreement with the Secretary heightens the deference due the Commission. See *Emerald Mines,* 863 F.2d at 53.

Even where disaster has yet to occur, the Commission's construction of § 111 makes sense. Confining compensation to cases where violations are so obvious as to allow immediate citations might deter miners from reporting imminent dangers, and inspectors from issuing withdrawal orders, where the blame is less apparent. Cf. *Rushton Mining Co. v. Morton,* 520 F.2d 716, 720 (3rd Cir.1975) (relying on similar incentive effects on miners and inspectors in construing predecessor to § 111); S.Rep. No. 95–181, 95th Cong., 1st Sess. 47 (1977) (noting that § 111 compensation will "remove any possible inhibition on the inspector in the issuance of closure orders"), *reprinted in* LEGISLATIVE HISTORY OF THE FEDERAL MINE SAFETY AND HEALTH ACT OF 1977, at 635 (1978). Or it might lead inspectors to include *pro forma* findings of violation in withdrawal orders, so as to protect min-

ers' § 111 entitlements even where no citation is then warranted.

Clinchfield might respond that these disincentives are not a serious concern, as a § 107 order can be modified. 30 U.S.C. § 817(d). Thus miners could call attention to ambiguous violations, knowing that if an imminent danger order were issued and later modified to include a finding of violation, they would receive § 111 compensation. But the power to modify evidently ceases after an order has been terminated, see Labor Brief 14 n. 10, J.A. 116, so one can readily understand why Clinchfield refrained from making the argument. If this were the only means of awarding compensation in the case of post-order discovery of a violation, MSHA might delay terminations of withdrawal orders in order to be able to modify them in accordance with later findings of violations, increasing operators' shutdown costs.

Petitioner notes that the critical sentence of § 111 allows compensation only after interested parties have been given "an opportunity for a public hearing, which shall be expedited in such cases, and after such [§ 104 or § 107 order] is final." 30 U.S.C. § 821. Its argument is not that the Commission's reliance on a later § 104(d) order deprives it of a hearing on the violation; in fact expedited hearings are available to contest § 104(d) orders. See 30 U.S.C. § 815(d). Rather its argument is that § 111's provision for an expedited hearing is rendered meaningless if § 111 liability is to be based in part on a closure order that does not allege a violation as issued. Congress, the argument implicitly runs, plainly intended a single hearing on the mine-closing order, which would resolve all the issues on which compensation depended and would occur before the order became final.

The Commission did not explicitly respond to this point in its decision (nor does the UMW before us), but we take their reading of § 111 in essence to give a kind of dual meaning to the word "order" in the phrase "idled due to such order." In cases such as Clinchfield's, the operator is entitled to a hearing on the mine-closing order before it becomes final, and to one on the

violation order before it becomes final. Once both are complete, compensation is proper.

There is an awkwardness to the Commission's view, both linguistically and practically. Under its bifurcated approach, the mine operator cannot know the full cost of a mine-closing order when it is issued—only that it will trigger compensation *if* it is followed by a safety citation. This might complicate the operator's choice on opposing a mine-closing order in which no violation is cited.

But that complication is not so grave as to undermine the case for the Commission's reading. There is inevitable uncertainty about the cost of a mine-closing order (as its duration cannot be known in advance), so it is not clear that uncertainty about the risk of having to pay one-week compensation will add much. Moreover, because the operator's dilemma will occur in any case where the charge of violation is added more than 30 days after issuance, Clinchfield's view would in many cases frustrate the practical interests mentioned above. A § 107 withdrawal order becomes final 30 days after issuance, even if not yet terminated; later modifications are contested separately. See 30 U.S.C. § 817(e). Thus Clinchfield's argument would defeat § 111 compensation in all cases except those in which an investigation could be wrapped up less than a month after an accident has happened or the imminent danger been discovered. The more severe the disaster, the less likely payment could be made. We therefore think the Commission's understanding a permissible one.

Our finding that the Commission's view was reasonable would be the end of the story were it not for our prior interpretation of the "for a failure" clause. In *District 6, UMWA v. United States Dep't of Interior Bd. of Mine Operations Appeals,* 562 F.2d 1260 (D.C.Cir.1977), we found that use of these words in § 111's predecessor provision allowed one-week compensation only where a shutdown was "*actually* ordered because of" the type of operator failure then covered, namely "unwarrantable" failures. See *id.* at 1263 (emphasis added); see also *id.* at 1261 n. 4 (text of predecessor provision). Although the circumstances in which liability could attach were more limited than they are now, the old version did not differ with respect to the critical language. Thus petitioner argues that under circuit law, which we are not free to alter, the mine-closing order must be one actually prompted by the finding of a violation.

We cannot escape this contention simply by noting that in *District 6* the court merely accepted the Commission's view, which acceptance would be completely consistent with our accepting a different Commission choice among permissible alternatives. See *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 863–64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984). The rub is that the *District 6* court did not view the Commission's prior view as simply a reasonable reading of an ambiguous statute, but as one "compell[ed]" by the language and legislative history. See *District 6,* 562 F.2d at 1266.

In doing so, however, this court relied on a narrower concept of judicial deference than what *Chevron* now plainly requires. In his concurrence to *District 6,* Judge Leventhal stated that "[q]uestions of legislative intent require the *courts,* in the last analysis, to reconstruct how the legislature would have decided the specific issue if it had been specifically addressed by the legislature." *Id.* at 1268 (Leventhal, J., concurring) (emphasis added). In light of Judge Leventhal's formula, and the panel opinion's own stated purpose "to determine which interpretation Congress intended," *id.* at 1265, we take the latter's conclusion that the language and history "compell[ed]" the no-compensation result to mean no more than that the panel regarded it as the better reading. Such a finding is not enough to bind the Commission under *Chevron.* The concept of review invoked by Judge Leventhal overlooked the possibility that Congress meant no more than to allow the agency to select among reasonable interpretations. *Chevron* presumes this to have been the case unless Congress has spoken clearly. See 467 U.S. at 842–44, 104 S.Ct. at 2781–83. Thus, while un-

der *District 6* we must assume that the Commission's former view was the better one, that decision is not a finding that Congress clearly resolved the issue, and it leaves the Commission free to choose the other if reasonable. We recently recognized that *Chevron* may alter the meaning of sister circuits' decisions that were based on a broader notion of judicial review, *Natural Resources Defense Council v. EPA*, 859 F.2d 156, 187 (D.C.Cir.1988), and here it has done so for one of our own.

In fact, *District 6* itself appeared to concede the reasonableness of the result before us, observing that to read § 111's predecessor as allowing payment even in absence of an order specifying violations would not be "completely outside the language of the statute ... [nor] be inconsistent with some of the general objectives of the Act." See 562 F.2d at 1264–65. Accordingly, affirmance of the Commission is consistent with *District 6.*

Petitioner complains that even if free to choose, the Commission has failed adequately to explain its about-face. But the Commission has done so. It noted that in the administrative decision reviewed in *District 6* there was no *agency* action connecting the closure with unwarrantable violations; it now regards the outcome there as having turned on the union's attempted usurpation of the agency's prosecutorial discretion. See *Westmoreland Coal,* 8 FMSHRC at 1328–29 n. 5; cf. *International Union, UMWA v. FMSHRC*, 840 F.2d 77, 84 n. 14 (D.C.Cir.1988) (highlighting *District 6*'s "reject[ion] of the [claimants'] offer to prove" an unwarrantable failure where no such finding was made by the Commission). We would have the same situation here if the UMWA alleged, but MSHA had not found, a connection between the March 1984 citations and the June 1983 explosion. While an explanation asserting the sort of policy analysis on which the Secretary relied might be more compelling, this somewhat narrower view suffices.

### C

■ Although § 111 makes no mention of interest, the Commission awarded claim-ants prejudgment interest on their compensation. It distilled from *Rodgers v. United States,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947), the general principle that (where legislation does not speak to the issue) the appropriateness of interest on a statutory obligation depends on the purpose of the statute, on whether the obligation is "in the nature of a debt rather than a penalty, and on the interplay of the relative equities involved." See *Clinchfield,* 10 FMSHRC at 1500–01; see also *United States v. United Drill & Tool Corp.,* 183 F.2d 998 (D.C. Cir.1950). It viewed all three factors as pointing in favor of interest. Clinchfield objects. We do not believe Congress clearly resolved the matter against interest, and, finding the Commission's interpretation a reasonable one, affirm.

The Commission found a statutory purpose to replace miners' wages in full (up to one-week's worth) to include allowance for prejudgment interest, stressing § 111's statement that qualifying miners "shall be fully compensated ... at their regular rates of pay" for the lesser of the closure or one week. Clinchfield argues that the Commission's reliance on "fully" is misplaced, as well as its reliance on cases allowing interest under any provisions calling for full compensation. See, e.g., *City of Chicago v. United States Dep't of Labor,* 753 F.2d 606 (7th Cir.1985) (construing Comprehensive Employment and Training Act); *EEOC v. County of Erie,* 751 F.2d 79 (2d Cir.1984) (Fair Labor Standards Act); *Hembree v. Georgia Power Co.,* 637 F.2d 423, 429–30 (5th Cir.1981) (Veteran Reemployment Rights Act); *Lodges 743 & 1746 v. United Aircraft Corp.,* 534 F.2d 422 (2d Cir.1975) (National Labor Relations Act). It characterizes § 111 as a carefully tailored measure of loss allocation, as it allows for compensation for no more than a week, even though the mine closure may last much longer. Thus, it seems to say, § 111 compensation is limited to the actual amount that would have appeared on a miner's paycheck.

We find the argument most unpersuasive. It seems obvious that $100 in 1990 is

not full compensation for $100 due in 1980. That the compensation is limited to one week affords no reason why it should be incomplete as to that period. Loss-sharing provisions can still require each party to bear in full the portion of the loss with which it is saddled. Thus in *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), the controlling statute apportioned the costs of disaster relief between state and federal authorities, but, for the particular item in question, provided that certain work should proceed "without charge to the United States." Section 226 of the Disaster Relief Act of 1970, 42 U.S.C. § 4436 (1970 ed.). Despite the overall sharing concept, the Court concluded that "[p]rejudgment interest is an element of complete compensation; fully repaying the Federal Government for any costs of site preparation will further the distribution of the burdens of disaster relief that Congress intended." 107 S.Ct. at 706 (citation and footnote omitted). Denying interest would, moreover, create an incentive for operators to delay proceedings, a matter not only troubling in itself but tending to aggravate the loss inflicted by the denial. We believe the Commission was within its statutory mandate in finding that allowance of interest was appropriate to give miners complete compensation for the share of the loss imposed by law on the operators.

Clinchfield does not question the Commission's view that the compensation is not a fine or penalty (which would be presumed not to carry interest, see *Rodgers*, 332 U.S. at 374–76, 68 S.Ct. at 7–8), or make any significant contention that the equities cut against inclusion of interest. Its primary remaining argument is an invocation of the doctrine of *expressio unius est exclusio alterius*—explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context. Section 105(c)(2) of the Mine Act was amended in 1977 to expressly provide for "back pay and interest" for miners discriminated against for blowing the whistle on safety violations. 30 U.S.C. § 815(c). Section 111 was also modified in 1977, but makes no mention of prejudgment interest.

The difficulty with the doctrine—and the reason it is not consistently applied, see, e.g., *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548 (1983); *United States Dep't of Justice v. FLRA*, 727 F.2d 481, 491 (5th Cir.1984),—is that it disregards several other plausible explanations for an omission. The drafter (here Congress) may simply not have been focussing on the point in the second context; and, where an agency is empowered to administer the statute, Congress may have meant that in the second context the choice should be up to the agency. Indeed, under *Chevron*, 467 U.S. at 842–44, 104 S.Ct. at 2781–82, where a court cannot find that Congress clearly resolved an issue, it presumes an intention to allow the agency any reasonable interpretative choice.

The possibilities either of neglect or of implied delegation to the agency grow more likely as the contrasted contexts grow more remote from each other. Though § 105 is related to § 111 in the sense that both provide compensation, the former covers the distinctive problem of the mistreated whistleblower. In amending § 105 in 1977, Congress in fact evinced a special concern for the completeness of the remedy afforded such a person, whose role may be critical in generating information about violations. See S.Rep. No. 95–181, 95th Cong., 1st Sess. 35–37 (1977), *reprinted in* LEGISLATIVE HISTORY 623–25. Clinchfield would obviously have a better case if provision for interest were made elsewhere *within* § 111. Cf. *United States v. Naftalin*, 441 U.S. 768, 771–74, 99 S.Ct. 2077, 2080–82, 60 L.Ed.2d 624 (1979) (comparing subsections of same section). As it is, the interest remedy of § 105 does not itself convince us that Congress "necessarily considered and rejected" it for § 111. See *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1232 (D.C.Cir. 1980) (quoting *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 676 (D.C.Cir. 1973)).

■ Finally, Clinchfield attacks the rate of interest awarded the miners.[1] Following the practice of the National Labor Relations Board, which in turn follows the statutory provision for interest on underpaid taxes, see 26 U.S.C. § 6621 (Supp.1986), the Commission here used the rate on three-year Treasury obligations, rounded to the nearest whole number and adjusted quarterly, plus three percentage points. Here the formula translated into interest varying between 9% and 13%. Clinchfield characterizes this rate as punitive; rather than proposing an alternative interest rate, it suggests adjustment on the basis of the consumer price index, which would give miners compensation for losses through inflation but none for the capacity of wealth to generate more wealth (and lenders' insistence on corresponding compensation), which a market interest rate reflects. See *Association of American Railroads v. ICC*, 846 F.2d 1465, 1474 (D.C.Cir.1988) (discussion of inflationary and real components of interest rate).

We are startled by the claim that the rate is punitive. The government, after all, pays only one percent less on *overpaid* taxes; the difference can hardly be said to represent a congressional finding that anyone underpaying his taxes is reprehensible or is to be punished for the oversight. Truly punitive rates—ones unrelated to any real costs of the use of money—are reserved for special offenders, such as those who fail without reasonable cause to file their tax returns at all. See 26 U.S.C. § 6651(a)(1) (1989) (imposing interest of 5% per month, not to exceed 25% in aggregate, in addition to ordinary underpayment interest and other penalties). Clinchfield appears to believe that the 3%-plus feature must as a matter of logic have rested on a punitive purpose, but we should think it readily attributable to the greater insecurity of loans to persons other than the federal government. And while Clinchfield complains of the Commission's lack of record evidence, we think that dispensable where it has chosen a congressionally determined figure for a seemingly comparable situation. The two situations vary, of course, but we see no reason to think that the Commission's neglect of the differences has hurt Clinchfield; it makes no claim that coal miners enjoy especially favorable borrowing costs.

\* \* \*

Finding each of the Commission's interpretations of the Mine Act not barred by any clear congressional determination to the contrary, and themselves reasonable, we affirm its decision.

---

**1.** Clinchfield apparently does not contest the date from which the interest was calculated, set by the ALJ at July 13, 1983. See *UMWA v. Clinchfield Coal Co.,* 9 FMSHRC 1276, 1278 (1987) (decision of ALJ Melick); *UMWA v. Clinchfield Coal Co.,* 10 FMSHRC 1493, 1507 (1988) (characterizing date as "stipulated").