902 F.2d 66
 284 U.S.App.D.C. 101
 CHENEY RAILROAD COMPANY, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and The United States of
America, Respondents,
Tyson Foods, Inc., CSX Transportation, Inc., Intervenors.
 No. 89-1219.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 9, 1990.
Decided April 27, 1990.
Opinion on Denial of Rehearing June 23, 1990.
Rehearing En Banc Denied June 23, 1990.
 
 William P. Jackson, Jr., with whom David C. Reeves, Arlington, Va., was on the brief, for petitioner.
 Evelyn G. Kitay, Attorney, for the I.C.C., with whom Robert S. Burk, Gen. Counsel and Ellen D. Hanson, Associate Gen. Counsel for the I.C.C., Washington, D.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Marion Jetton, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. John P. Fonte, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 John A. Menke, with whom Fritz R. Kahn, Washington, D.C., was on the brief, for intervenor Tyson Foods, Inc.
 Charles M. Rosenberger, Lawrence H. Richmond, Washington, D.C. and Peter J. Schudtz were on the brief, for intervenor CSX Transp., Inc.
 Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 The Interstate Commerce Commission has forced CSX Transportation, Inc. to sell its rail trackage between Greens and Ivalee, Alabama, which it had intended to abandon. The Commission's order allowed the line to be split, at CSX's option but against the wishes of petitioner Cheney Railroad Company, between the petitioner and another applicant. Cheney challenges primarily the Commission's authority to review simultaneously, and ultimately to approve, competing purchase applications other than the one filed first (in this case, its own). We uphold the Commission's action in all respects.
 
 
 2
 * * *
 
 
 3
 Cheney Lime & Cement Company operates a plant near Graystone, Alabama, which has been served for more than 80 years by the 54.61-mile rail line running southwest to northeast between Ivalee (near Gadsden) and Greens (near Birmingham), at both of which points it connects with the rest of the CSX network. See Figure A. In 1983 CSX's predecessor issued public notice of its intention to abandon the line. See 49 U.S.C. Sec. 10904(e)(2)(B) (1989). A limestone products factory without access to rail transportation is apparently not good for much, and so Cheney Lime owner Alan B. Cheney formed Cheney Railroad Co. (here referred to simply as Cheney) as a vehicle to acquire the track from CSX. In the wake of unfruitful negotiations, Cheney on March 19, 1987 filed a purchase application for the entire route under 49 U.S.C. Sec. 10910 (1988), which requires the forced sale of track designated for abandonment where "a financially responsible person" offers to buy.
 
 
 4
 Enter Tyson Foods (billed to us as the world's largest producer of poultry), which had purchased land adjacent to the northern end of the line as a site for a new feed mill. On April 20, 1987, Tyson filed its own Sec. 10910 application pursuant to 49 CFR Sec. 1151.2(d) (1989) (allowing for filing of competing applications within 30 days of initial application),[1] but sought only the 1.61-mile segment adjoining the Ivalee connection. To Cheney's eye, Tyson's filing was a set-up arranged by CSX and aimed at precluding competition for "overhead" traffic, i.e., traffic neither starting nor ending along the route. Cheney argued that under Sec. 10910 the Commission could assess applications only in the order received, and must accept the first qualifying application filed. The Commission rejected Cheney's motion, see Cheney Railroad Co.--Feeder Line Acquisition--CSX Transportation, Inc. Line Between Greens and Ivalee, AL, Finance Docket No. 31012 (May 28, 1987) (unpublished), and subsequently found both applicants "financially responsible." Cheney Railroad Co.--Feeder Line Acquisition--CSX Transportation, Inc. Line Between Greens and Ivalee, AL, 5 I.C.C.2d 250 (1989). CSX was allowed the option to take only Cheney's bid, or to divide the line between the two applicants. With the same order, the Commission denied Cheney's fallback plea for permission to construct a bypass track around Tyson's segment and an accompanying interchange with the main CSX line at Ivalee. Cheney appealed.
 
 
 5
 * * *
 
 
 6
 Cheney argues that Sec. 10910 does not "authorize" competing applications. Of course nothing in Sec. 10910 prohibits the filing of successive applications by different parties, and if two are filed the Commission must handle them in some way. The only issue is how. Cheney asserts that Congress intended a pure system of first come, first served, and that the Commission acted unlawfully in even considering Tyson's application until it had finally disposed of (indeed, finally rejected) Cheney's. The argument first highlights Sec. 10910's language: when track has been designated for abandonment and "an application to purchase such line has been filed ... by a financially responsible person, the Commission shall require the rail carrier owning the railroad line to sell such line to such financially responsible person." 49 U.S.C. Sec. 10910(b)(1) (emphasis added). If Congress contemplated simultaneous assessment of competing applications, Cheney tells us, it would have used "any" in place of "an", "a", and "such". We are unable to find in the language even the faintest hint that Congress meant to establish some rule for the treatment of competing applications filed at about the same time; the language of Sec. 10910 simply conditions the Commission's power to force a sale on the filing of an application by at least one financially responsible person.
 
 
 7
 Cheney next makes a structural argument. In the Staggers Act, of which Sec. 10910 is a part, Congress addressed another, parallel situation. In Sec. 10905 it established procedures for forced sale where a railroad has not only designated but has applied for final Commission approval for abandonment; in that context it gave directions as to how the ICC should handle competing applications. See 49 U.S.C. Sec. 10905(c) & (f)(3) (providing that "any person" may request forced sale, and allowing the seller to choose among those found "financially responsible"). Cheney makes a conventional claim that expressio unius est exclusio alterius--"explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context." Clinchfield Coal Co. v. FMSHRC, 895 F.2d 773, 779 (D.C.Cir.1990).
 
 
 8
 Scholars have long savaged the expressio canon. Max Radin called it "one of the most fatuously simple of logical fallacies, the 'illicit major,' long the pons asinorum of schoolboys." Statutory Interpretation, 43 Harv.L.Rev. 863, 873-74 (1930) (citation omitted). See also Reed Dickerson, THE INTERPRETATION AND APPLICATION OF STATUTES 234-35 (1975); Richard A. Posner, Statutory Interpretation--in the Classroom and in the Courtroom, 50 U.Chi.L.Rev. 800, 813 (1983); cf. State of Illinois, Dep't of Public Aid v. Schweiker, 707 F.2d 273, 277 (7th Cir.1983) ("Not every silence is pregnant"). The Supreme Court has more charitably dubbed it "a valuable servant, but a dangerous master." Ford v. United States, 273 U.S. 593, 612, 47 S.Ct. 531, 537, 71 L.Ed. 793 (1927) (quoting Colquhoun v. Brooks, 21 Q.B.D. 52, 65). Whatever its general force, we think it an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved. Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). See also Clinchfield Coal, 895 F.2d at 779 (expressio unius insufficient to establish unambiguous intent under Chevron ); TRT Telecommunications Corp. v. FCC, 876 F.2d 134, 146 (D.C.Cir.1989) (same). Here the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion. Such a contrast (standing alone) can rarely if ever be the "direct[ ]" congressional answer required by Chevron. See 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 
 9
 Cheney thus turns to the legislative history. The House proposal, which ultimately emerged as Sec. 10910, had contained a provision giving the ICC some specific directions on how to handle competing applications. See 126 Cong.Rec. H8622-23 (1980) (containing proposed requirement that Sec. 10910 applicant file "notice of intent to acquire" including "a statement that other interested parties may also propose to acquire the line," along with mandate to Commission that it give preference to shipper applicants). This dropped out, without explanation, in the final version. Again the claim is one of contrast--they had one solution in the draft, none in the final. Again the answer is that the purpose of the omission is clear in only one respect: Congress decided not to mandate simultaneous evaluation in Sec. 10910 proceedings. In the absence of affirmative and significant evidence that Congress intended the omission to be read as a mandate of first-come-first-served, we find Congress not to have precluded or required any particular solution to roughly simultaneous applications for Sec. 10910 transfers. See American Trucking Ass'n v. United States, 344 U.S. 298, 309-10 & n. 10, 73 S.Ct. 307, 314 & n. 10, 97 L.Ed. 337 (1953) (declining to read deletion of explicit extension of Commission authority as bar to exercise of such authority). Compare Railroad Consolidation Procedures, 366 I.C.C. 75, 83-84 (1982) (applying simple priority rule where statute imposed time constraints on proceedings and thus made multiple assessments impractical).
 
 
 10
 Of course, the Commission's choice must still be reasonable and accord with the general purposes of the statute at issue. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. Here it chose to make simultaneous assessments of the competing applications, and to allow the selling carrier to pick among qualified applicants. As to the first, the Commission noted: "Until a proceeding is completed, we do not know which, if any, applicant is a 'financially responsible person' and whether that applicant will actually buy the line at the price we set. Considering applications one at a time may thus delay transfer of a line. This would be contrary to the purposes of the feeder line development program, one of which is to preserve feeder lines." 5 I.C.C.2d at 254. This seems both reasonable in itself and faithful to a Staggers Act objective "to preserve [rail] service to protect existing shippers," Simmons v. ICC, 697 F.2d 326, 329 (D.C.Cir.1982), all the more so in light of Commission regulations which close the window on competing applications 30 days after an initial application is received. See 49 CFR Sec. 1152.1(d) (1989). As this reasoning is ample, we have no need to evaluate the Commission's alternative idea--that simultaneous assessment is required by the Supreme Court's decision in Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). We note, however, that unlike the statute at issue in Ashbacker, and others to which the doctrine has been extended, Sec. 10910 does not drive the agency to a general "public interest, convenience or necessity" standard for its decisions. See Ashbacker, 326 U.S. at 330 n. 4, 66 S.Ct. at 149 n. 4 (reproducing statute at issue). Where that aspiration is imposed, an agency is arguably required to adopt procedures that result in the selection of superior candidates. See New South Media Corp. v. FCC, 685 F.2d 708, 715 (D.C.Cir.1982). Section 10910's mandate to certify "a financially responsible person" carries no such message.
 
 
 11
 In its Reply Brief Cheney adds an attack on the Commission's decision to allow CSX to choose among qualified purchasers, as opposed to picking one itself. The attack comes too late. Cheney does not appear to have challenged that aspect of the decision before the Commission, see its Motion to Reject Competing Application, J.A. 162, and Petition to Reopen Decision Denying Motion to Reject Competing Application, J.A. 327, and further failed to do so in its main brief here. See Reyes-Arias v. INS, 866 F.2d 500, 504 n. 2 (D.C.Cir.1989).[2]
 
 
 12
 * * *
 
 
 13
 Cheney makes only two additional points that merit answer. It challenges as arbitrary the Commission's decision to deny it an interchange with CSX at Ivalee. Acknowledging that direct interchange would interfere with Tyson's loading operations, see J.A. 494, it offered to construct 4000 feet of new track alongside the existing line. The Commission was at least reasonable in denying this request; Sec. 10910 seems aimed only at the transfer of existing lines, not the creation of new ones. See 5 I.C.C.2d at 263-64; H.R.Conf.Rep. No. 96-1430, 96th Cong.2d Sess. at 124 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978. The Commission did compel CSX to grant Cheney an interchange at Greens/Mt. Pinson--through which all local traffic, including Cheney Lime's freight, had previously been carried--, thereby satisfying Sec. 10910(d)'s requirement that "reasonable interchange" be afforded the purchaser. If Cheney wishes to pursue its plan for new track and an Ivalee interchange, it appears able to do so under Secs. 10901 (or exemptions) and 10742, at least if interstate transportation is at issue. The Commission reads its own order as not closing the door on that possibility, see Brief of Respondents 33-34, an understandable view in light of the apparent unfitness of the request for redress in the Sec. 10910 context.
 
 
 14
 Cheney further contends that the Commission unlawfully found part of Tyson's acquisition to be in the public interest as defined by Sec. 10910. A few hundred yards (.15 of a mile) of the track for which Tyson alone applied had not been identified for abandonment on CSX's route map; the Commission was thereby required under Sec. 10910(b)(1)(A)(i) to find that portion of the forced sale to be in the public convenience and necessity as defined in Sec. 10910(c)(1). (It made this part of the sale contingent on CSX's choosing to sell Tyson the rest of the trackage it requested, to avoid Tyson's acquiring a worthless rump. See 5 I.C.C.2d at 278.) Decrying possible anticompetitive consequences (Tyson's acquisition would effectively thwart overhead traffic along the rest of the route), Cheney attacks the conclusion as an abuse of discretion. Cheney might have a case if the statute left "public convenience and necessity" undefined, but here in fact the statute shows that increased competition is not a goal of feeder preservation. Far from it: the Commission may require a "public convenience" sale only where it finds that the transfer will not have an adverse effect on the financial or operational performance of the selling carrier, 49 U.S.C. Secs. 10910(c)(1)(C) & (D), so competition cuts against, not for, the necessary finding. Of course where the entire track sought has been designated for abandonment, the adverse-effect test will be inapplicable, and any effects on competition between the seller and buyer will be irrelevant.
 
 
 15
 Cheney uses the anticompetitiveness line as a doctor uses the red-rubber hammer, expecting our knees to jerk. But even if it were clear that CSX put Tyson up to the deal, with the aim of reducing the risk of competition from Cheney for overhead traffic, the fact would not get Cheney where it wants to go. Section 10910 does not preclude a carrier forced to sell track it would rather abandon from using such a stratagem to minimize the adverse consequences. The Greens-to-Ivalee line remains in operation under the Commission's decision. Cheney Lime still has its outlet, as do all other shippers along the way. That is what the law was meant to accomplish. The petition is
 
 
 16
 Denied.
 
 
 17
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEON REHEARING
 
 
 18
 Per Curiam: In its petition for rehearing, Cheney Railroad challenges our finding that it had not properly raised before the Commission the question of whether a rail spur is subject to Commission authority under 49 U.S.C. Sec. 10910. Pet. for Rehearing 12-13; majority op. at 70, n.2. Cheney is correct to note that its argument before us did not depend on 49 U.S.C. Sec. 10907(b)(1) (exempting spurs from Commission authority under Secs. 10901-10906), but rather on the construction of "railroad line" used in Sec. 10910 itself. See Brief of Petitioner 31.
 
 
 19
 The error does not however change the result or our decision nor does it require us to address the merits of Cheney's claim. Before the Commission, Cheney did not contend that the Commission had exceeded its powers under Sec. 10910 by authorizing the transfer to Tyson of something other than a "railroad line." Instead, Cheney's characterizations of the Tyson axquisition as "spur" or the like were for purposes of other arguments, namely, whether Tyson would be "able to assure adwquate transportation" over the track, see J.A. 173, 340-41, or whether Cheney was entitled to an interchange at Ivalee. See J.A. 559, 562, 563. If an attack along the lines now suggested by Cheney can be detected at the agency level, it was not sufficiently articulate to require an answer either from the Commission or from us. Cf. City of Vernon v. FERC, 845 F.2d 1042, 1047 (D.C. Cir. 1988).
 
 
 20
 There being no merit to Cheney's other grounds for rehearing, the petition is denied.
 
 
 
 [1]
 April 20, 1987, fell on a Monday, and Tyson's application was therefore timely under Commission rules. See 49 CFR Sec. 1104.7(a) (1989)
 
 
 [2]
 Nor has Cheney properly raised the argument that Tyson's 1.61-mile stretch constitutes a spur and as such is excepted from Commission authority by virtue of 49 U.S.C. Sec. 10907(b)(1). Despite its numerous characterizations of Tyson's proposed segment before the agency as a spur or industrial siding, see Cheney Reply Brief 10 n. 11, it never challenged the Commission's authority to allow the sale to Tyson on Sec. 10907(b)(1) grounds. We cannot properly address an argument that the Commission, through no fault of its own, had no occasion to analyze. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952)