Willie T. SMITH, Jr., Plaintiff,

and

Eleanor Chassy, Intervening Plaintiff,

v.

Thomas EHRLICH et al, Defendants.

Civ. A. No. 76–1445.

United States District Court,
District of Columbia.

Dec. 23, 1976.

Leon Friedman, Hempstead, N. Y., Melvin L. Wulf, Amer. Civil Liberties Union Foundation, New York City, for plaintiffs.

Charles F. Lettow, Washington, D. C., for defendants.

Before McGOWAN, Circuit Judge, and HART and GREEN, District Judges.

## OPINION OF THE COURT

HART, District Judge:

 The plaintiff and intervening plaintiff in this action are staff attorneys of legal services agencies funded by the Legal Services Corporation [Corporation], a corporation created by Congress to provide legal assistance to the poor. They have asked this Court,[1] by way of a Motion for Preliminary and Permanent Injunction, to declare unconstitutional and enjoin enforcement of a portion of the Legal Services Corporation Act, § 1007(a)(6), 42 U.S.C. § 2996f(a)(6) (Supp. V 1975), [the Act], and regulations promulgated thereunder, 41 Fed.Reg. 25,-900–25,901 (1976) (to be codified in 45 C.F.R. 1608.5(c)), that prevent staff attorneys[2] from seeking election to partisan or nonpartisan political offices during the peri-

---

1. Since this case seeks to enjoin the enforcement of a federal statute on the grounds of unconstitutionality, a three-judge district court was convened pursuant to 28 U.S.C. §§ 2282 and 2284 (1970). This procedural step is not disturbed through the repeal of § 2282 and the substantial revision of § 2284 by Act of August 12, 1976, Pub.L. No. 94–381, §§ 2–3, 90 Stat. 1119; a savings clause in this repealer provides that actions commenced prior to August 12, 1976 shall not be affected. The instant case was commenced on August 4, 1976.

2. Section 1002(7) of the Act, 42 U.S.C. § 2996a(7), provides that " 'staff attorney' means an attorney who receives more than one-half of his annual professional income from a recipient organized solely for the provision of legal assistance to eligible clients under this subchapter . . .."

od for which they receive compensation from the Corporation.[3]

■ There is no question that both the plaintiff and the intervenor have engaged in political activities that subject them to possible disciplinary action, including termination of employment from their respective legal services agencies.[4] Plaintiff Smith has sought re-election to the Board of Trustees of the School District of Greenville County, South Carolina,[5] and intervenor Chassy ran for election to a Justice Court judgeship in Merced County, California.[6] Although these candidacies occurred in the course of "non-partisan" elections, such activity is clearly prohibited by the Act, which requires the Corporation to

" * * * insure that staff attorneys refrain at any time during the period for which they receive compensation under this subchapter . . . from political activities of the type prohibited by section 1502(a) of Title 5, whether partisan or nonpartisan; . . ." 42 U.S.C. 2996f(a)(6).

The reference to 5 U.S.C. 1502(a) is to a portion of the Hatch Act which provides in relevant part that a person subject to its coverage may not "be a candidate for elective office." 5 U.S.C. § 1502(a)(3).

The constitutional attack on the Act is a dual one, although the issues are interrelated. On the one hand it is claimed that the restriction on nonpartisan candidacies contravenes the staff attorneys' First Amendment rights to free expression. As an independent matter, they assert that the provisions violate their right to equal protection of the law as guaranteed by the Fifth Amendment.

I.

■ The history of the Supreme Court's interpretation of the Hatch Act makes it abundantly clear that Congress has power to regulate the *partisan* political activities of government employees. *See Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Plaintiffs urge, however, that this line of authority is directed solely at prohibitions of partisan activity, and that the considerations which led to the validation of the Hatch Act are not analogous to a situation involving a nonpartisan election.

We cannot agree with this contention. It is true, of course, that *Mitchell* and *Letter Carriers* relied heavily on the dangers that partisan political activity pose to an effective public service. Nowhere in either of these opinions, however, is there any intimation that Congress was limited to controlling only partisan behaviour. In fact,

---

**3.** Staff attorneys are not employees of the federal government, nor do they receive compensation directly from the Corporation. These lawyers, are, however, employees of legal services programs funded under grants or contracts with the Corporation, and as such are subject to regulation by the Act. Without a doubt the United States has the power to fix the terms upon which its money allotments to the states are disbursed. *See Oklahoma v. Civil Service Commission,* 330 U.S. 127, 143, 67 S.Ct. 544, 91 L.Ed. 794 (1947). This statutory arrangement has no bearing on the constitutional questions raised herein since Congress may not impose unconstitutional conditions on recipients of federal funds.

**4.** The responsibility to take "appropriate remedial or disciplinary action" to enforce § 1007(a)(6) rests initially with the governing bodies of local programs. § 1006(b)(2), 42 U.S.C. § 2996e(b)(2). If the local program fails to insure that its employees refrain from activi-

ties proscribed by the Act, the Corporation may sanction the recipient program. § 1006(b)(1), 42 U.S.C. § 2996e(b)(1).

**5.** Smith alleges that he announced his candidacy for reelection and on July 26, 1976 filed his official nominating statement. Shortly before the election was to take place, however, he withdrew as a candidate. Despite Smith's withdrawal, the Corporation has indicated that it cannot agree to take no disciplinary action in his case. *See Plaintiff's Memorandum in Support of Motion for Preliminary and Permanent Injunction,* filed September 27, 1976, at 5.

**6.** Defendants have agreed to withhold action to enforce § 1007(a)(6) of the Act in connection with Chassy's candidacy pending the outcome of this case. *See Defendant's Memorandum Opposing Plaintiff's Motion for a Preliminary and Permanent Injunction,* filed October 22, 1976 at 6 n. 7.

the *Letter Carriers* decision rather unequivocally reaches the opposite conclusion:

"We agree with the basic holding of *Mitchell* that plainly identifiable acts of political management and political campaigning on the part of federal employees may constitutionally be prohibited." 413 U.S. at 567, 93 S.Ct. at 2891.

■ The general proposition of these cases is that "the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Letter Carriers,* 413 U.S. at 564, 93 S.Ct. at 2890. Undoubtedly there are limits on the power of the national legislature to control the political activities of federal employees. But, in determining whether a particular prohibition has transgressed the Constitution, we do not direct the inquiry toward determining if a particular *type* of activity is prohibited. Rather, the question in each case is whether the statutory scheme is "'within reasonable limits,' even though the regulation trenches to some extent upon unfettered political action." *Mitchell,* 330 U.S. at 102, 67 S.Ct. at 571.

■ In measuring the reasonableness of a statute such as this, great deference must be accorded to the judgment of our elected representatives inasmuch as "the determination of the extent to which political activities of governmental employees shall be regulated lies primarily with Congress." *Mitchell,* 330 U.S. at 102, 67 S.Ct. at 571. And in the case before us there is ample evidence that Congress fully weighed the

dangers of both partisan and nonpartisan political activity when it passed the Legal Services Corporation Act.[7] The considerations relevant to partisan political action are well documented in the Hatch Act cases, and need not be reiterated at this time. In developing the Legal Services Corporation, however, Congress looked to "practice, history, and changing educational, social and economic conditions," *Mitchell,* 330 U.S. at 102, 67 S.Ct. at 571, when it determined that regulation reaching beyond partisan activity was necessary. The congressional debates in both Houses are replete with assertions of concern over the political actions taken by legal services attorneys.[8] The program, originally funded pursuant to provisions of the Economic Opportunity Act of 1964, 42 U.S.C. § 2809(a)(3) (1970), had become "controversial and embattled,"[9] 119 Cong.Rec. 40475, much to the detriment of the poor whose mission it was to serve. Indeed, the "central objective of the legislation," was "to free the program from outside political influence," 119 Cong. Rec. 40476, and to that end great emphasis was placed upon the creation of a politically independent legal services corporation.

■ It may be true that many, if not all, of the abuses that were of concern to Congress could have been solved through the prohibition of solely partisan activities. But, "whether there are such differences and what weight to attach to them, are matters of detail for Congress." *Mitchell,* 330 U.S. at 102, 67 S.Ct. at 570. In this respect, it is useful to note the words of Representative Quie, who was responsible for proposing the amendment that added the prohibition on nonpartisan activity:

---

**7.** Although the Act was passed in 1974, it had been the subject of hearings and debates in the Congress since 1969. *See* 119 Cong.Rec. 20691; 20699; 40467. Prior to final adoption, both Houses had reported out bills establishing an independent legal services corporation, only to find them vetoed or abandoned in conference under threat of veto. *See* 119 Cong.Rec. 20705. Consequently, by the time an act acceptable to the President was produced, the Congress had "examined at great detail almost every specific provision that is now found," 119 Cong.Rec. 20699, in the legislation.

**8.** *See, e. g.,* 119 Cong.Rec. 20685–20741; 40459–40472; 40474–40479; 41075–41087.

**9.** Senator Javits attributed the troubles of legal services to litigation initiated by staff attorneys which placed them in direct conflict with state and local governments. 119 Cong.Rec. 40476. It is understandable, with this background in mind, why Congress would not want these lawyers to hold elected positions at the state and local level.

"The reason for adding nonpartisan is, as in many states—I know especially in the State of Minnesota—mayor races, county commissioner races, and so forth, are not partisan elections and do not carry a party label." 119 Cong.Rec. 20741.

Apparently, it was the judgment of Congress that the distinction between partisan and nonpartisan politics is often one without a difference. Furthermore, our representatives concluded that staff attorneys, who are on the firing line of a demanding profession, should not be diverted from their task by the influence of politics. We see nothing in the Constitution which prevents the Congress from making these policy determinations.

## II.

In advancing their equal protection argument, plaintiffs note that legal services lawyers are treated differently from other employees covered by the Hatch Act. The latter are allowed to engage in nonpartisan candidacies, while staff attorneys are prohibited from doing so.

 Merely stating that one group is treated differently from another does not raise a distinction to the point of constitutional objection. Recognizing this, we are urged to hold that a fundamental right is involved here, such that under the principles of *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); see *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), a compelling need must be demonstrated to justify the unequal treatment. And there is some force to this point given the holding of *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), that the regulation of First Amendment freedoms can only be justified by a compelling state interest. Notwithstanding the *Rhodes* decision, "neither the right to associate nor the right to participate in political activities is absolute in any event." *Letter Carriers,* 413 U.S. at 567, 93 S.Ct. at 2891.

In every Hatch Act case the government employee's right to political expression has been treated differently from the rest of the population. But, none of these cases imposed a requirement that the regulation be justified by a compelling state interest. Given this clear line of authority, and the obvious public interest in legislation of this type, see Part I, *supra,* we do not feel that strict scrutiny need by applied to those parts of the Act in question here.

Since we hold that a fundamental right is not involved in this case, the Act still must be examined to determine whether it rationally furthers some legitimate state purpose. *See San Antonio School District v. Rodriquez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). At the outset, though, it must be recognized that under this "relatively relaxed standard," the distinctions drawn by the legislature are "presumed to be valid." *Murgia,* 96 S.Ct. at 2567; see *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

 The necessity for legislation of this type has been amply demonstrated in Part I, *supra.* Plaintiffs, argue, however, that despite these valid legislative concerns Congress has acted irrationally in distinguishing legal services lawyers from all other government employees. Specifically, they say that it makes little sense to single out staff attorneys for special treatment when other government lawyers, including attorneys working directly for the Corporation,[10] are allowed to run for nonpartisan offices. The simple answer to this is that legal services staff attorneys form a natural class of individuals who serve a program that in the judgment of Congress has been subjected to detrimental political pressure. Beyond this, there may be good reason to treat the staff attorney differently from a lawyer representing the government (or the Corporation) itself. Legal services lawyers frequently come in direct conflict with state and local governments in the course of rep-

10. Direct Corporation employees are permitted to be candidates for nonpartisan offices while recipient staff attorneys are not. *See* 41 Fed.

Reg. 25,900–25,901 (1976) (to be codified in 45 C.F.R. 1608.5(c)).

resenting their clients.[11] As a matter of fact, a significant number of cases concern the representation of those who have grievances before or against local school boards.[12] Congress apparently decided that it would be improper for a staff attorney like plaintiff Smith to be placed in a potential conflict of interest with the school board to which he seeks election. And it is no answer to say that he could merely disqualify himself from such cases, for the whole point of the Act is to provide legal assistance to those who have no other counsel available. Nor is it enough to contend that another attorney within the legal services organization could take the case, for Congress could have feared that the political motivation of one attorney might be brought to bear upon another. Certainly it was one of the legislative aims to make sure that the impoverished remain confident that they are properly and adequately represented.[13] In seeking this goal it seems entirely rational for Congress to remove even the implication of impropriety from a program whose very success was determined to be dependent upon its freedom from political influence.[14]

Accordingly, the plaintiff and intervening plaintiff's complaints are dismissed and judgment will be entered in favor of the defendants.

11. *See* note 9, *supra.*

12. *See e. g.,* 119 Cong.Rec. 20694; 20697; 20702.

13. *See* 120 Cong.Rec. 15,001.

14. Plaintiffs also argue that the statutory scheme is irrational in view of the amendments made to the Hatch Act in 1974. Those amendments allowed state and local employees whose positions are paid for by federal funds to engage in political management and political campaigns; employees are still prohibited from partisan candidacies. *See* Pub.L. No. 93–443, Title IV, § 401(a), 88 Stat. 1290 (October 15, 1974). Since the prohibitions on legal services lawyers are tied to the Hatch Act restrictions, staff attorneys may act as political managers in any type of election, but may not themselves be a candidate in a nonpartisan election. Plaintiffs argue that this is a major loophole in the Act, and essentially vitiates the scheme because political management is a more "serious and pernicious form of political activity." *Plaintiff's Memorandum, supra* note 5, at 20. It seems to us that this is the very type of judgment that is appropriately left to Congress. Moreover, the prohibition on candidacies makes sense by itself in terms of avoiding the outright conflict of interest situations that we have noted above.