**TEXAS RURAL LEGAL AID, INC., et al.**

v.

**LEGAL SERVICES CORPORATION, Appellant.**

No. 90–7109.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1991.

Decided Aug. 2, 1991.

Charles J. Cooper, with whom Michael A. Carvin was on the brief, Washington, D.C., for appellant.

Paul Nielsen, with whom Richard J. Oparil, Alan W. Houseman, and Linda E. Perle were on the brief, Washington, D.C., for appellees.

Before MIKVA, Chief Judge, and D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Three legal services organizations funded by the national Legal Services Corporation ("LSC") brought suit in district court to enjoin the enforcement of a regulation promulgated by LSC that prohibits recipient programs from engaging in redistricting litigation or related activities. *See* 45 C.F.R. Part 1632 (1990). The district court ruled in favor of the local organizations and granted the injunction, holding that LSC lacked statutory authority to promulgate the regulation because caseload selection and priority decisions are committed by statute to the discretion of local program recipients. *See Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, 740

F.Supp. 880 (D.D.C.1990). We reverse the district court and uphold LSC's interpretation of its statutory authority to issue regulations of this kind. We reject LSC's argument, however, that the district court should be directed to dismiss appellees' claim that LSC acted arbitrarily and capriciously in promulgating the redistricting regulation or, alternatively, that this court should decide the claim on its merits. The district court, because of its resolution of the statutory question, did not reach this claim, and we believe it should have the opportunity to do so on remand. Finally, we also decline to reach appellees' First Amendment challenge (also not reached by the district court) to one aspect of the regulation.

## I. BACKGROUND

LSC was created by the Legal Services Corporation Act of 1974 ("LSCA" or "the Act"), Pub.L. No. 93–355, 88 Stat. 378 (codified as amended at 42 U.S.C. §§ 2996–2996*l* (1988)), "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." LSCA § 1003(a), 42 U.S.C. § 2996b(a). LSC makes and administers grants to approximately 325 local organizations that provide free legal assistance to eligible clients or perform other functions supporting the provision of legal services to clients. *See* LSCA § 1006(a), 42 U.S.C. § 2996e(a). The program recipients that directly assist clients (known as "basic field programs") employ more than 4,000 attorneys and serve more than 1.3 million clients annually. Their collective service areas cover the entire United States.

The Act requires basic field programs to assess the legal needs of the eligible client populations in their respective service areas and to establish caseload priorities responsive to those needs. *See* LSCA § 1007(a)(2)(C), 42 U.S.C. § 2996f(a)(2)(C). Although specific priorities vary, the basic field programs commit the bulk of their resources to providing legal assistance in areas such as housing, family law, entitle-

ment programs, and consumer matters. *See* 54 Fed.Reg. 10,569 (1989).

The basic field programs traditionally have established their priorities without interference from LSC concerning the substantive nature of the matters they may handle, although the Act itself contains a number of limitations. These include bars on the use of funds granted under the Act for, *inter alia,* criminal defense work, political activity, labor organizing, strikes, abortion and school desegregation litigation, and lobbying. *See* LSCA § 1007, 42 U.S.C. § 2996f. Recipient programs are also prohibited from using private funds for any activity proscribed by the Act. *See* LSCA § 1010(c), 42 U.S.C. § 2996i(c). Recipient staff attorneys are barred from engaging in political activities, *see* LSCA §§ 1006(e), 1007(a)(6), 42 U.S.C. §§ 2996e(e), 2996f(a)(6), and generally may not engage in the outside practice of law. *See* LSCA § 1007(a)(4), 42 U.S.C. § 2996f(a)(4). LSC appropriations acts in recent years have added further limitations on the use of LSC funds. *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub.L. No. 101–515, § 607, 104 Stat. 2101, 2148–53 (1990) (detailing restrictions currently in effect).

In March 1989, LSC published a proposed regulation prohibiting "any redistricting activity" by program recipients. 54 Fed.Reg. 10,569 (1989). After receiving and considering written comments, LSC revised the rule in certain respects and published it in final form on August 3, 1989, to be effective September 5, 1989. *See* 54 Fed.Reg. 31,954 (1989). The regulation defines "redistricting" as "any effort, directly or indirectly, to participate in the revision or reapportionment of a legislative, judicial, or elective district at any level of government, including influencing the timing or manner of the taking of a census." 45 C.F.R. § 1632.2. Program recipients are prohibited under the regulation from "advocating or opposing any plan, proposal, or litigation intended to or having the effect of altering any redistricting at any level of government." 45 C.F.R. § 1632.3. As revised prior to being finalized, the regulation

makes clear that (1) litigation under the Voting Rights Act is permissible so long as it does not involve redistricting; (2) the prohibition does not prevent recipients from using public or tribal funds for the purposes for which they were provided, including redistricting (this tracks a general exception in section 1010(c) of the Act, 42 U.S.C. § 2996i(c), regarding use of such funds for otherwise prohibited activities); (3) employees of recipients may be involved in redistricting activities so long as their involvement does not make use of program resources and is done on their own time, does not involve identification with the program, and is not done in the context of legal advice and representation; and (4) the regulation does not prohibit activities permitted by 45 C.F.R. Part 1604, governing the outside practice of law by program attorneys. *See* 45 C.F.R. § 1632.4.

LSC's stated reason for promulgating the regulation was that redistricting activities "are not related to the delivery of basic day-to-day legal services to the poor and are intertwined with impermissible political activity." 54 Fed.Reg. at 10,569. LSC also argued that alternative sources of legal assistance typically are available to handle redistricting matters and that, because redistricting cases usually generate attorneys' fees, permitting recipients to work on such cases places them in competition with members of the private bar. *See id.*

Appellees, three basic field programs funded by LSC, filed suit in district court alleging that LSC lacked statutory authority to issue the regulation, that LSC acted arbitrarily and capriciously in promulgating the regulation, and that the regulation violates the First Amendment. The district court ruled on behalf of appellees on the basis of their statutory claim and therefore did not reach the other issues raised. The court relied primarily on section 1007(a)(2)(C) of the Act, as amended, 42 U.S.C. § 2996f(a)(2)(C), which provides that LSC shall "insure that ... recipients, consistent with goals established by the Corporation, adopt procedures for determining and implementing priorities for the provision of [legal] assistance...." According to the district court, the language and leg-

islative history of this provision demonstrate that "Congress intended that recipients be permitted to select their cases free of LSC control and subject only to congressional prohibitions." *Texas Rural Legal Aid,* 740 F.Supp. at 884. The Act authorizes LSC to play only a "limited administrative role," the court continued, and LSC's contrary position "distort[s] the text of the LSC Act into a grant of almost unlimited policy control of the entire program." *Id.* at 885. Accordingly, the court entered summary judgment in favor of appellees and enjoined enforcement of the regulation.

## II. ANALYSIS

### A. Chevron*'s Applicability to LSC Rulemaking*

■ LSC is a federally-chartered nonprofit corporation of the District of Columbia. *See* LSCA § 1003, 42 U.S.C. § 2996b. Under the Act, LSC is not deemed an agency, department, or instrumentality of the federal government, nor are its directors or employees deemed to be officers or employees of the United States. *See* LSCA §§ 1005(e), 1004(c), 42 U.S.C. §§ 2996d(e), 2996c(c). There appear to be no federal court decisions addressing the applicability of the deference principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to a federally-chartered corporation of this sort. Both parties assume that *Chevron* applies to interpretations of the Act by LSC and that deference therefore must be accorded to any reasonable interpretation it advances of ambiguous statutory provisions. The district court did not address the issue, although the court's opinion suggests that no deference is owed to LSC's position because it clearly conflicts with the Act and its legislative history.

We conclude that the basic principles of *Chevron* apply to the statutory scheme created by the Act and the role contemplated for LSC under it. Congress has "entrusted" LSC with the duty to "administer" the Act, *see Chevron,* 467 U.S. at 844, 104 S.Ct.

at 2782, and (as discussed more fully below) has delegated to LSC the authority to "'fill any gap left ... by Congress.'" *Id.* at 843, 104 S.Ct. at 2782 (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). LSC, although not subject to the provisions of the Administrative Procedure Act ("APA"), is required to engage in notice-and-comment rulemaking under the provisions of its own Act, *see* LSCA § 1008, 42 U.S.C. § 2996g, indicating that Congress intended that it be treated for these purposes like an agency of the government. Moreover, Congress's decision to create LSC as an independent corporation reflected a conscious effort to ensure its freedom from political interference. *See* H.R.REP. No. 247, 93d Cong., 1st Sess. 1–2 (1973), *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 3872, 3873–74; S.REP. No. 495, 93d Cong., 1st Sess. 6 (1973). This underlying purpose further buttresses the conclusion that LSC was intended to have the full measure of interpretive authority under the Act contemplated by *Chevron.*

Although they do not dispute *Chevron's* applicability, appellees do argue that less deference should be accorded LSC's construction of the Act here because the redistricting regulation represents a reversal of LSC policy. Appellees cite for this proposition *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), where the Supreme Court stated that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Id.* at 446 n. 30, 107 S.Ct. at 1221 n. 30 (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). Appellees then point to a 1978 LSC regulation stating that "[t]he specific method for setting and reporting [caseload] priorities, as well as the priorities themselves, remain a matter for decision by the recipients." 43 Fed.Reg. 51,789 (1978).

LSC does not dispute, however, that the basic field programs have authority to establish caseload priorities in accordance with local needs, arguing rather that the field programs do not possess *exclusive* authority to set priorities, particularly with respect to those classes of cases that LSC determines do not meet the national goals established by the Act. The regulatory statement cited by appellees simply does not address LSC's view of its statutory authority to set priorities; it establishes only that, at that time, LSC's policy was to allow basic field programs to set their own priorities without interference. This may demonstrate that the redistricting regulation was a "reversal of [LSC's] former views as to the proper course" of conduct and that LSC therefore may be required to supply "a reasoned analysis for the change" in order to avoid the charge that its action was arbitrary or capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983). These considerations simply are not relevant, however, to the *Chevron* issue raised here concerning the scope of LSC's statutory authority.

■ LSC's interpretations of the Act therefore must be upheld unless "Congress has directly spoken to the precise question at issue" and has resolved it against LSC, or unless the regulation cannot be termed a "permissible construction" of the Act or is arbitrary or capricious. *See Chevron,* 467 U.S. at 842–44, 104 S.Ct. at 2781–83.

## B. *LSC's Statutory Authority to Promulgate the Regulation*

Appellees argue, and the district court agreed, that the Act contains no affirmative authority for LSC to promulgate the redistricting regulation and that certain provisions of the Act conflict with it. They further argue that the legislative history of the Act and its amendments indicates that Congress intended basic field programs to have exclusive authority to set caseload priorities. LSC challenges all of these assertions, contending that the Act provides more than ample support for its authority to issue the redistricting regulation and that the regulation is fully consistent with all provisions of the Act and with the legislative history. We conclude that the Act

clearly grants both general and specific rulemaking powers to LSC and that, although specific provisions of the Act are somewhat ambiguous concerning limitations on those powers, LSC's interpretations of those provisions are permissible under *Chevron.*

### 1. *LSC's Rulemaking Authority Under the Act*

Appellees contend that the Act does not grant general rulemaking authority to LSC, but rather permits LSC to promulgate regulations only for certain enumerated purposes, none of which provides authority for the redistricting regulation. We agree with LSC that the Act clearly does grant it general rulemaking authority and that, regardless, it possessed ample authority under the Act's more specific grants of rulemaking authority to promulgate the redistricting regulation.

Initially, LSC notes that, as the Supreme Court has stated, "[t]he power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Further, under *Chevron,* statutory silence or ambiguity on a particular question means that "a court may assume that Congress implicitly delegated the interpretive function to the agency...." *Public Citizen v. FTC,* 869 F.2d 1541, 1553 (D.C.Cir.1989). Although LSC is not deemed an agency of the federal government, it is charged with administering the Act, and its authority under the Act is phrased in expansive rather than restrictive terms. LSC is authorized, among other things, to "provide financial assistance to qualified programs," LSCA § 1006(a)(1)(A), 42 U.S.C. § 2996e(a)(1)(A), to "make ... grants and contracts as are necessary to carry out the purposes and provisions" of the Act, LSCA § 1006(a)(1)(B), 42 U.S.C. § 2996e(a)(1)(B), and to "insure that grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas." LSCA § 1007(a)(3), 42 U.S.C. § 2996f(a)(3).

LSC emphasizes in particular the breadth of authority conferred by the last of these provisions, noting that courts have read this language, and similar language in other statutes, to confer broad discretionary powers. *See, e.g., Spokane County Legal Services, Inc. v. Legal Services Corp.,* 614 F.2d 662, 669 (9th Cir.1980) (application of Act's "economical and effective delivery" provision "necessarily 'requires the use of informed discretion' by LSC") (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 208, 67 S.Ct. 1575, 1583, 91 L.Ed. 1995 (1947)); *AFL–CIO v. Kahn,* 618 F.2d 784, 788–92 (D.C.Cir.) (words "economy" and "efficiency" are "not narrow terms" and, when used in federal procurement statute, supported authority to deny government contracts to companies that failed to comply with voluntary wage and price standards), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979). We agree that this provision gives LSC substantial power to regulate the "delivery of legal assistance" by program recipients and supports the contention that LSC possesses general rulemaking authority under the Act. Appellees argue that this provision should be disregarded because LSC did not rely on it in issuing the regulation, but the record clearly shows that LSC did cite section 1007(a)(3) as one of the provisions supporting its authority to promulgate the regulation. *See* 54 Fed.Reg. at 31,959.

Other provisions of the Act provide further support for LSC's authority to issue the redistricting regulation. First, the Act grants LSC the "powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act...." LSCA § 1006(a), 42 U.S.C. § 2996e(a). A private corporation, certainly, has the power to set the terms of grants it makes to other entities; equally important is the fact that, as explained earlier, Congress elected this organizational form for LSC in order to ensure its independence. This strongly implies that Congress intended to give LSC considerable discretion in implementing the Act. Appellees stress in response that sec-

tion 1006(a) gives LSC the powers of a D.C. nonprofit corporation only "[t]o the extent consistent with the provisions" of the Act, but that objection implicates the separate question (addressed below) of whether any specific provisions of the Act prohibit LSC from exercising its power in the manner it has here; it does not imply that LSC has anything less than the general interpretive and rulemaking authority that normally inheres in agencies or other entities charged with administering a statute.

Second, the Act charges LSC with the duty to ensure that the legal services program remains free of partisan political influence and involvement. *See* LSCA §§ 1006(b)(5), 1007(a)(6), 42 U.S.C. §§ 2996e(b)(5), 2996f(a)(6); *cf.* LSCA §§ 1001(5), 1006(e), 42 U.S.C. §§ 2996(5), 2996e(e). As LSC maintains, redistricting almost inevitably implicates partisan political concerns. *See, e.g., Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973) ("[p]olitics and political considerations are inseparable from districting and apportionment"). LSC promulgated the redistricting regulation because it believed that its statutory mandate in this respect would best be implemented by "remov[ing] even the implication of impropriety from a program whose very success was determined to be dependent upon its freedom from political influence." *Smith v. Ehrlich*, 430 F.Supp. 818, 823 (D.D.C.1976) (three-judge district court) (rejecting First Amendment challenge to statutory prohibition of political activities by staff attorneys of LSC recipient programs). Particularly in light of Congress's own decision to bar legal services litigation on hotly contested issues such as school desegregation and abortion, *see* LSCA § 1007(b), 42 U.S.C. § 2996f(b), LSC's decision to enact a similar ban on redistricting litigation appears consistent with one of the fundamental purposes underlying the Act.

No different conclusion is compelled by the exceptions in subparts (B) and (C) of section 1007(a)(6) for "legal advice and representation" in connection with the activities prohibited therein. Those subparts generally prohibit attorneys of recipient programs from providing transportation to the polls or "similar assistance in connection with an election" and from assisting in voter registration activities. (Significantly, subpart (A) of section 1007(a)(6), which prohibits "any political activity" by attorneys of recipient programs, does *not* contain an exception for legal advice and representation.) We agree with LSC that redistricting activities are not encompassed within the rather narrow scope of these election-related provisions, and we therefore reject appellees' conclusion that the exceptions for legal advice and representation contained in them constitute affirmative statutory authorization for redistricting activity.

Considering all of these provisions together, we conclude that the Act invests general rulemaking authority in LSC and that the Act's more specific grants of authority buttress LSC's power to promulgate the redistricting regulation.

### 2. *The Regulation's Consistency with Other Provisions of the Act*

Appellees argue that even if LSC has the rulemaking powers outlined above, the redistricting regulation conflicts with certain other provisions contained in the Act. We consider each of these provisions in turn.

 a. *Section 1007(a)(2)(C).* The first provision cited by appellees, and the provision chiefly relied upon by the district court in its decision, states that LSC shall "insure that ... recipients, consistent with goals established by the Corporation, adopt procedures for determining and implementing priorities for the provision of [legal] assistance...." LSCA § 1007(a)(2)(C), 42 U.S.C. § 2996f(a)(2)(C). The district court held that this provision "authorizes LSC to set goals relating to the procedures by which LSC recipients set priorities, not to itself determine substantive case priorities." *Texas Rural Legal Aid*, 740 F.Supp. at 886. The district court buttressed its interpretation by contrasting the current version of this provision with the language originally enacted in 1974 and by consulting the legislative history of the 1977 amendments to

the Act, which changed the provision to its present form. *See id.* at 883–84.

Although we do not agree with LSC's contrary position that section 1007(a)(2)(C) actually provides clear support for its authority to set substantive priorities, we do believe that the provision is ambiguous and that we should defer to LSC's interpretation. First, the language of the provision simply does not clearly support either appellees' or LSC's interpretation. Although section 1007(a)(2)(C) states that the procedures adopted by program recipients for setting priorities must be "consistent with goals established by" LSC, the placement of the latter phrase does not necessarily imply that *only* the procedures—and not also the priorities set by those procedures—must be consistent with LSC regulations. Section 1007(a)(2)(C) can just as easily be read as subordinating *both* the procedures and priorities adopted by local programs to the national goals established by LSC, or as simply not addressing LSC's authority concerning priorities at all. In the latter instance, the provision would do nothing to constrain LSC's general rulemaking powers; in the former, it would supplement and support those powers.

Second, the changes effected in section 1007(a)(2)(C) by the 1977 amendments to the Act do not compel the conclusion that Congress intended to place exclusive authority over caseload priorities in the hands of the local programs. As originally enacted, section 1007(a)(2)(C) directed LSC to "establish priorities to insure that persons least able to afford legal assistance are given preference in the furnishing of such assistance." The House report accompanying the 1977 amendments indicates that the new version of section 1007(a)(2)(C) reflected Congress's determination that establishing poverty as the sole criterion for allocating program resources risked leaving unaddressed certain legal problems of importance to the poor. *See* H.R.REP. No. 310, 95th Cong., 1st Sess. 10–11, *reprinted in* 1977 U.S. CODE CONG. & ADMIN.NEWS 4503, 4512. The House report then stated:

> Reference to goals that may be established by the Corporation permits the Corporation to set as goals the provision of legal assistance in the most effective manner, or so as to have the greatest effect on problems of poor people, or other similar goals. The reference is not intended to detract from the rightful role of local programs, in consultation with local client communities, to set priorities concerning the substantive law matters to which scarce program resources are to be allocated. This does not require the Corporation to establish goals, but authorizes the Corporation to do so if it finds appropriate.

*Id.* at 4513; *cf.* S.REP. No. 172, 95th Cong., 1st Sess. 35 (1977). Although this passage clearly contemplates that local programs will have a major, and perhaps even preeminent, role in setting program priorities, it does not necessarily imply that LSC should exercise no control at all over those priorities. The reference to the "rightful role" of local programs in setting priorities, in conjunction with the statement that LSC may set goals "so as to have the greatest effect on problems of poor people," arguably implies that LSC and local programs are *both* to play roles in establishing priorities. LSC interprets the "rightful role" of local programs to be the assessment of the peculiar local needs of client populations, while LSC's own role is to provide caseload guidance based on considerations that it deems are not dependent on local conditions. In the instant case, LSC determined that redistricting activities raised concerns of general import analogous to those that motivated Congress to prohibit certain other categories of litigation, and it therefore acted to prohibit local programs from engaging in those activities. We believe that a reasonable construction of section 1007(a)(2)(C) and its legislative history supports LSC's authority to make such assessments. Under this interpretation of the Act, the roles of the local programs and LSC are complementary, with each exercising authority within the realm of its special expertise. There is thus no cause for asserting, as the district court did, that LSC's position would make the local boards "mere puppets" of LSC. *See Texas Rural Legal Aid,* 740 F.Supp. at 884.

**b. *Statutory Prohibitions on Litigation.*** Appellees argue next that the redistricting regulation is inconsistent with the specific substantive prohibitions included in the Act by Congress (*e.g.*, the bans on school desegregation and abortion litigation) because Congress intended those prohibitions to be exclusive. The only support appellees provide for this assertion, however, is the general evidence they adduce that Congress meant to deprive LSC of any authority to control the caseload priorities established by basic field programs. Having rejected appellees' argument on that point, we reject their argument on this one as well.

Although they do not explicitly cite it, appellees appear to rely on the canon of statutory interpretation, *expressio unius est exclusio alterius* ("the expression of one is the exclusion of others"). Whatever its usefulness in other circumstances, however, this canon has little force in the administrative setting. *See, e.g., Cheney Railroad Co. v. ICC*, 902 F.2d 66, 68–69 (D.C.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 519, 112 L.Ed.2d 530 (1990); *Clinchfield Coal Co. v. Federal Mine Safety & Health Comm'n*, 895 F.2d 773, 779 (D.C. Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990). Under *Chevron*, we normally withhold deference from an agency's interpretation of a statute only when Congress has "directly spoken to the precise question at issue," 467 U.S. at 842, 104 S.Ct. at 2781, and the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue. *See Cheney Railroad Co.*, 902 F.2d at 69. Having decided that, we must defer to LSC's refusal to read the Act in the manner suggested by the *expressio* canon if its interpretation is otherwise reasonable. *See id.; Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285, 1292 (D.C.Cir.) (*"Chevron* implicitly precludes courts picking and choosing among various canons of statutory construction to reject reasonable agency interpretations of ambiguous statutes") (emphasis deleted), *aff'd without opinion by an equally divided Court*, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989).

In any event, an equally pertinent canon of interpretation states that a congressional decision to prohibit certain activities does *not* imply an intent to disable the relevant administrative body from taking similar action with respect to activities that pose a similar danger. *See, e.g., Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 372–73, 93 S.Ct. 1652, 1662–63, 36 L.Ed.2d 318 (1973); *Bailey v. Federal Intermediate Credit Bank*, 788 F.2d 498, 500 (8th Cir.), *cert. denied*, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986). The *expressio* maxim is inappropriate in the administrative context, these cases suggest, because its application "would undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency." *Mourning*, 411 U.S. at 372, 93 S.Ct. at 1662. Indeed, a congressional prohibition of particular conduct may actually *support* the view that the administrative entity can exercise its authority to eliminate a similar danger. *Id.* at 372–73, 93 S.Ct. at 1662–63. Here, LSC determined that the dangers of entanglement in controversial local issues such as school desegregation and abortion were presented as well by redistricting litigation and, accordingly, justified imposing a similar ban on program recipients. Particularly in light of the Act's mandate to LSC to ensure that the legal services program remain free from partisan political involvement, we cannot conclude that LSC's position is based on an unreasonable interpretation of the Act. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387, 103 S.Ct. 683, 689–90, 74 L.Ed.2d 548 (1983) (*expressio* maxim and other canons of interpretation " 'long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose' ") (quoting *SEC v. C.M. Joiner Leasing Corp.*; 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943)).

**c. *Section 1010(c).*** Appellees' next argument is more narrowly drawn but also relies implicitly on the *expressio* maxim. They claim that the redistricting regulation's prohibition on the use of private funds by program recipients for redistrict-

ing activities conflicts with section 1010(c) of the Act, 42 U.S.C. § 2996i(c), which provides that private funds received for the provision of legal assistance "shall not be expended by recipients for any purpose prohibited by this subchapter...." This provision was intended to prevent local programs from "contraven[ing] the other restrictions in the act by attributing them to the non-Federal share of funds contributed to such programs." 120 CONG.REC. 24,026 (1974) (summary of Act by Senator Nelson). Appellees read into section 1010(c) a congressional intent to bar use of private funds *only* for purposes prohibited by the Act itself (as they try to read a similar exclusivity into Congress's enactment of those prohibitions), but the only support they provide for this assertion, other than the language of the provision and similar language in the legislative history, is the fact that Congress has on several occasions overridden by statute other LSC regulations that limited the use of private funds by program recipients. *See, e.g.,* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub.L. No. 101–515, § 607, 104 Stat. 2101, 2152 (1990) (use of private funds for legislative representation); *id.,* 104 Stat. at 2153 (use of private funds for financially ineligible clients).

Reliance on subsequent legislative history of this sort, however, is notoriously suspect and " 'form[s] a hazardous basis for inferring the intent of an earlier [Congress].' " *Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories,* 460 U.S. 150, 165 n. 27, 103 S.Ct. 1011, 1021 n. 27, 74 L.Ed.2d 882 (1983) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960)). In any event, consulting these later actions by Congress does not persuade us that they support appellees' position. Notably, Congress did not respond to LSC's prior regulations on the use of private funds by enacting a general provision barring LSC from imposing limitations in excess of those provided by the Act, nor has Congress taken any action with respect to the specific limitation contained in the redistricting regulation. Appellees direct our

attention to a statement by Senator Rudman that expresses general dissatisfaction with LSC's "misguided view of its authority to extend the coverage of regulations it promulgates to private funds." 135 CONG. REC. S7233 (daily ed. June 23, 1989). Yet Senator Rudman also seemed to recognize that LSC does have some authority to regulate the use of private funds by program recipients, stating only that LSC had "over-extend[ed]" that authority. *Id.* The kind of regulation at issue here, which is more closely akin to the prohibitions specifically enumerated by Congress itself in the Act than were the regulations overridden by Congress, would seem to further rather than impede the purposes underlying the Act and to justify the exercise of LSC's authority to limit the use of private funds. At the very least, we cannot say that LSC's interpretation of its authority in this respect is an impermissible construction of the Act. If Congress disagrees with LSC's action, it remains free to override this part of the redistricting regulation, as it has done in other situations.

d. *Section 1007(a)(5).* Appellees also challenge the redistricting regulation's prohibition of legislative representation in connection with redistricting matters. *See* 45 C.F.R. § 1632.2 (prohibiting "any effort, whether by request or otherwise, even if of a neutral nature, to revise a legislative, judicial, or elective district at any level of government"). This provision, they argue, conflicts with section 1007(a)(5) of the Act, 42 U.S.C. § 2996f(a)(5), which prohibits program recipients from using federal funds to engage in legislative representation of clients except (1) when "necessary to the provision of legal advice and representation with respect to such client's legal rights and responsibilities," or (2) when a legislative body or agency either requests the recipient "to testify, draft, or review measures or to make representations" to the body or agency or "is considering a measure directly affecting the activities" of the local program or LSC. Because the redistricting regulation's ban on legislative representation sweeps more broadly than the provisions contained in section 1007(a)(5),

appellees conclude that LSC lacked authority to impose it.

Once again, however, appellees fail to explain why the Act's failure to prohibit certain activities on a general basis prevents LSC from imposing such a restriction in specific situations where it deems it necessary or prudent. Furthermore, it is not clear to us that the exceptions to the lobbying limitation in the Act necessarily apply in situations where (as with school desegregation and abortion) the Act bars program recipients from engaging in certain types of substantive legal activities. In any event, program recipients presumably would have few, if any, occasions to lobby on behalf of "[a] client's legal rights and responsibilities" with respect to prohibited activities, precisely because they generally are barred from representing clients on those matters.

■ e. *Section 1006(b)(3).* Finally, appellees argue that the absence of a grandfather clause exempting redistricting activities currently being conducted by local program recipients violates section 1006(b)(3) of the Act, 42 U.S.C. § 2996e(b)(3), which requires LSC to "ensure that activities under this subchapter are carried out in a manner consistent with attorneys' professional responsibilities." Because the regulation would require immediate withdrawal of local program attorneys from redistricting cases, appellees conclude that it would force these attorneys to violate their ethical obligations to their clients.

Appellees acknowledge, however, that the Ethics Committee of the American Bar Association has upheld withdrawal by an attorney in the face of a loss of LSC funding, provided that the attorney has given notice to the client and has made efforts to find other funding or substitute counsel. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 347 (1981). Appellees provide no reason for assuming that a different standard would be applied to attorneys forced to withdraw from pending redistricting cases because of the regulation at issue here. Furthermore, LSC has granted partial or temporary waivers for several pending cases brought by attor-

neys for two of the organizations involved in this litigation, indicating that LSC will administer the regulation flexibly. Should withdrawal of funding confront any local program attorneys with the risk of violating their ethical responsibilities, we trust that LSC will show similar flexibility, in conformity with its statutory duty to prevent such violations.

For all of the foregoing reasons, we hold that LSC's interpretations of the contested statutory provisions are permissible constructions of the Act. We therefore reject appellees' assertion that the regulation is inconsistent with those provisions.

### C. *Appellees' Arbitrary and Capricious Claim*

In addition to their statutory arguments, appellees also challenged the redistricting regulation before the district court on the ground that LSC acted arbitrarily and capriciously in promulgating it. The district court denied LSC's motion for dismissal or for summary judgment on the latter claim in light of its resolution of the statutory issues in favor of appellees. Because we reverse the district court's holding on the statutory issues, we must address two arguments LSC makes concerning the arbitrary and capricious claim. First, LSC asks this court to reverse the district court's denial of its motion, arguing that judicial review is unavailable for this claim. Alternatively, LSC urges us to reject appellees' claim on the merits. We decline both invitations.

The Act exempts LSC from the requirements of the APA by providing that LSC is not an agency, department, or instrumentality of the federal government. *See* LSCA § 1005(e), 42 U.S.C. § 2996d(e); *Spokane County Legal Services*, 614 F.2d at 669. This in itself, however, does not mean that LSC's actions are shielded from judicial review. As discussed at length above, LSC is invested with broad administrative authority to carry out the terms of a federal statute; for that reason, its actions must be treated as those of a public rather than a private actor. Furthermore, although Congress clearly meant to insulate LSC

from the vagaries of political pressure by making it an independent corporation rather than a federal agency, we can find nothing in the Act or the legislative history to suggest that it meant to insulate LSC's actions from judicial review. *See, e.g., Armstrong v. Bush*, 924 F.2d 282, 291 (D.C.Cir.1991) (absent "clear and convincing evidence" of contrary congressional intent, there is a "presumption in favor of judicial review" of administrative action) (relying on *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). Appellees point to a passage in the House Report accompanying the 1977 amendments to the Act stating that LSC is "accountable directly and only to the Congress" under the Act, but this statement, when read in context, clearly refers only to Congress's concern to "protect the Corporation from inappropriate control by the Executive Branch." H.R. REP. No. 310, 95th Cong., 1st Sess. 6, *reprinted in* 1977 U.S. CODE CONG. & AD-MIN.NEWS 4503, 4508. It simply does not address the issue of judicial review of LSC action. *See Armstrong v. Bush*, 924 F.2d at 291–92 (Congress's intent to retain oversight over compliance with Federal Records Act insufficient to infer intent to preclude judicial review).

■ We therefore conclude, along with every other court that has addressed the issue, that LSC's substantive policy decisions, although exempt from the APA, are subject to the pre-APA requirement that administrative decisions be rationally based—a standard that courts have held is equivalent to the APA's requirement that agency action not be arbitrary or capricious. *See, e.g., Spokane County Legal Services*, 614 F.2d at 669 & n. 11; *National Clearinghouse for Legal Services, Inc. v. Legal Services Corp.*, 674 F.Supp. 37, 40 & nn. 7–8 (D.D.C.1987), *aff'd mem.*, 861 F.2d 303 (D.C.Cir.1988); *National Center for Youth Law v. Legal Services Corp.*, 749 F.Supp. 1013, 1016 (N.D.Cal.1990). *See also State Farm*, 463 U.S. at 42–43, 103 S.Ct. at 2866–67 (equating arbitrary and capricious standard with rationality review); *San Juan Legal Services, Inc. v. Legal Services Corp.*, 655 F.2d 434, 439

(1st Cir.1981) (declining to specify appropriate standard but apparently assuming that action must at least be rational).

■ LSC's alternative argument, that this court should reject appellees' arbitrary and capricious claim on the merits, calls on us to exercise our discretion to rule on an issue not addressed by the district court. Although "[i]t is the general rule ... that a federal appellate court does not consider an issue not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* at 121, 96 S.Ct. at 2877. We have stated that in exercising this discretion we will look to factors such as whether the issue in question has been fully briefed by the parties and whether decision of the issue would be aided by the development of a factual record in the district court. *See Grace v. Burger*, 665 F.2d 1193, 1197 n. 9 (D.C.Cir.1981), *aff'd in part and vacated in part on other grounds sub nom. United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

■ In this case, we find the absence of any substantive briefing on the issue dispositive. LSC, the party urging us to reach the issue, contented itself with conclusory assertions in its opening and reply briefs that adoption of the regulation was not arbitrary or capricious because redistricting is an inherently political matter of little peculiar relevance to the legal problems of the poor. Appellees did not address the merits of the claim at all, urging only that we remand the claim for discovery and factfinding in the district court. This court normally will not address claims raised in such a cursory fashion. *See, e.g., Railway Labor Executives' Ass'n v. United States Railroad Retirement Bd.*, 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (declining to reach issue "on the basis of briefing which consisted of only three sentences in [petitioner's] brief and no discussion of the relevant statutory text, legislative history,

or relevant case law"); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983); *Alabama Power Co. v. Gorsuch,* 672 F.2d 1, 7 & n. 34 (D.C.Cir.1982) (collecting cases). As indicated above, this is especially true where, as here, the issue was not passed upon below.

Although we agree with appellees that their arbitrary and capricious claim should be remanded for a full airing in the district court, we decline to hold that they are entitled to discovery upon remand. "Ordinarily, judicial review of informal agency rule-making is confined to the administrative record; neither party is entitled to supplement that record with litigation affidavits or other evidentiary material that was not before the agency." *Edison Electric Institute v. OSHA,* 849 F.2d 611, 617–18 (D.C.Cir.1988) (relying on *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). *See also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Environmental Defense Fund v. Costle,* 657 F.2d 275, 284–85 (D.C.Cir.1981). The general principle that informal agency action must be reviewed on the administrative record predates the APA and therefore applies with equal force to actions taken by LSC. *See, e.g., Federal Security Administrator v. Quaker Oats Co.,* 318 U.S. 218, 227–28, 63 S.Ct. 589, 594–95, 87 L.Ed. 724 (1943); *National Broadcasting Co. v. United States,* 319 U.S. 190, 227, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 145–46, 59 S.Ct. 754, 764–65, 83 L.Ed. 1147 (1939); *United States v. Morgan,* 313 U.S. 409, 421–22, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941) (mental processes of decisionmaker not normally discoverable). *See also Holloway v. Railroad Retirement Bd.,* 44 F.Supp. 59 (N.D.Ga.1942) (collecting cases). On remand, therefore, discovery should not be permitted on appellees' arbitrary and capricious claim unless they can demonstrate unusual circumstances justifying a departure from this general rule. *See Environmental Defense Fund v. Costle,* 657 F.2d at 285 (surveying limited exceptions to rule against non-record evidence); *Natural Resources Defense Coun-*

*cil v. Train,* 519 F.2d 287, 292 (D.C.Cir. 1975) (permitting "limited discovery" in certain circumstances to ensure that "[no] documents which are properly part of the administrative record have been withheld").

### D. *Appellees' First Amendment Claim*

Appellees' final challenge to the redistricting regulation before the district court was their claim that the regulation's prohibition on the use of private funds for redistricting activities violates the First Amendment. As with appellees' argument that LSC acted arbitrarily and capriciously in promulgating the regulation, however, the district court declined to reach the First Amendment issue because it had resolved the statutory issues in appellees' favor.

Although we would hesitate to reach the merits of this claim in any event given the district court's failure to reach them, we find added reason to do so in our remand of appellees' arbitrary and capricious claim. "[I]t is an elementary canon that American courts are not to 'pass upon a constitutional question … if there is also present some other ground upon which the case may be disposed of.'" *Syracuse Peace Council v. FCC,* 867 F.2d 654, 657 (D.C.Cir.1989) (quoting *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)), *cert. denied,* —— U.S. ——, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). *See also Massachusetts v. Westcott,* 431 U.S. 322, 323, 97 S.Ct. 1755, 1756, 52 L.Ed.2d 349 (1977); Mikva, *Jumping at Constitutional Questions is Risky Business,* LITIGATION, Spring 1988, at 5. Because this case may be resolved against LSC on the basis of the arbitrary and capricious claim, we decline to reach the First Amendment challenge.

On remand, the district court, if it reaches the merits of this claim and finds that the appellee organizations have a First Amendment interest in representing clients in redistricting matters, should of course be guided by the Supreme Court's decisions on the constitutionality of placing speech-related conditions on the receipt of governmental funds. *See Rust v. Sullivan,* ——

U.S. ——, 111 S.Ct. 1759, 1773–75, 114 L.Ed.2d 233 (1991) (upholding regulations barring family planning clinics that receive federal funds from providing abortion counselling or referrals, but noting that challenged regulations explicitly permit recipients to establish financially distinct affiliates, financed by private funds, for engaging in prohibited activities); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 400, 104 S.Ct. 3106, 3127–28, 82 L.Ed.2d 278 (1984) (federal statute that barred editorializing by public television and radio stations violated First Amendment because it extended to affiliated organizations financed entirely by private funds).

We note, finally, that it is implicit in our discussion of appellees' statutory claims that LSC, which is entrusted with the duty to administer a federal statute and to interpret its terms, is a state actor for First Amendment purposes when it issues regulations pursuant to that statute. LSC's contentions to the contrary should therefore provide no pause to the district court if it reaches appellees' First Amendment claim.

III. CONCLUSION

The district court's judgment on appellees' statutory claims is reversed. We decline to reach appellees' claim that LSC acted arbitrarily and capriciously in promulgating the regulation, as well as their claim that the restriction on the use of private funds for redistricting activities violates the First Amendment. These claims are remanded to the district court for further proceedings consistent with this opinion.

So ordered.