REGIONAL MANAGEMENT CORPORATION, INC.; Regional Finance Corporation of South Carolina, Inc.; and Regional Finance Corporation of Georgia, Inc., Plaintiffs,

v.

LEGAL SERVICES CORPORATION, Defendant.

No. 6:97–1311–20.

United States District Court, D. South Carolina, Greenville Division.

July 2, 1998.

**566**

Wallace K. Lightsey, Gregory J. English, Greenville, SC, for Plaintiffs.

Roger G. Chandler, Spartanburg, SC, Peter Tepley, Columbia, SC, for Defendant.

## ORDER

HERLONG, District Judge.

This matter is before the court on the cross-motions of Regional Management Corporation, Inc.; Regional Finance Corporation of South Carolina, Inc.; Regional Finance Corporation of Georgia, Inc. (collectively, "RMC"); and Legal Services Corporation ("LSC") for summary judgment. With the consent of the parties, the court will consider these motions and resolve this case on the merits. All motions, responses, and replies are now before the court. Having read and digested the parties' arguments, for the reasons set forth herein, the court grants the plaintiff's motion in part and denies it in part. Similarly, the court grants a portion of the defendant's motion for summary judgment and denies the defendant's motion in part.

### I. STATEMENT OF THE CASE

On February 1, 1996, RMC filed an administrative complaint with LSC, alleging wrongdoing by several local legal services organizations. RMC accused the South Carolina Legal Services Association ("SCLSA"), Palmetto Legal Services, Inc. ("PLS"), Neighborhood Legal Assistance Program, Inc. ("NLAP"), Susan B. Berkowitz ("Berkowitz"), Gary Weatherhead ("Weatherhead"), and Deborah Dantzler ("Dantzler") (hereinafter referred to by last name or collectively as "legal services attorneys") of lobbying in violation of federal law and LSC guidelines. Following this filing, RMC requested certain documents generated during LSC's investigation, citing the Freedom of Information Act, 5 U.S.C. §§ 552 *et seq.* ("FOIA"). Under a long-standing LSC policy, LSC refused to produce the documents. LSC issued its decision on December 16, 1996, concluding that no party named in RMC's complaint violated any federal law or LSC regulation. Following its decision, LSC released the disputed investigative documents to RMC.

On May 6, 1997, RMC filed the instant action seeking judicial review of LSC's decision. On March 18, 1998, following a hearing

regarding discovery in the case, both parties agreed to allow the court to rule on the merits of the case. The parties filed motions for summary judgment on April 30, 1998. LSC filed a memorandum opposing RMC's motion on May 14, 1998. On May 15, 1998, RMC filed a corresponding opposition motion. Finally, on May 29, 1998, both RMC and LSC replied to one another's opposition motions. The matter is ripe for a decision.

## II. STATEMENT OF THE FACTS

This is a case about money and politics. RMC is a corporation that provides loans in various states, including South Carolina and Georgia. RMC lends its money to individuals who would not be able to obtain financial assistance from other institutions. LSC is a quasi-public corporation created by the United States Congress. *See* 42 U.S.C. §§ 2996, *et seq.* ("the Act"). LSC's charge is to "provide high quality legal assistance to those who would be otherwise unable to afford adequate legal counsel[.]" *Id.* at § 2996(2). It does this through the administration of funds to various local legal services organizations located throughout the country. RMC and LSC service the same clientele: individuals with low income who would not be able to obtain similar services elsewhere. The present conflict arose when these two entities attempted to offer their respective services to the same pool of individuals.

### A. Lobbying Efforts

The episodes that form the basis of this action occurred at two distinct times and places. First, RMC asserts that Berkowitz, on behalf of SCLSA and PLS, illegally lobbied the 1994–95 session of the South Carolina General Assembly ("General Assembly") for the passage of a specific piece of legislation. Second, Berkowitz and the remaining legal services attorneys and groups are said to have violated federal guidelines by testifying before a Georgia administrative agency in 1995. The court will address each instance in turn.

#### 1. South Carolina

In 1994 and 1995, LSC granted funds to several South Carolina legal service organizations, including SCLSA, PLS, and NLAP.[1] All of these local groups performed similar functions which, in addition to traditional legal representation, included presenting client concerns to the South Carolina legislature. During the 1994–95 legislative year, the General Assembly considered South Carolina Act 135 of 1995 ("Act 135"). Act 135 sought to restrict the ability of financial institutions, such as RMC, to refinance certain outstanding loans and communicate with clients whose accounts were past due. Berkowitz, working through SCLSA and PLS, spoke with several legislators about the necessity of Act 135. Act 135 ultimately became law in South Carolina. Berkowitz, a registered lobbyist, does not deny these allegations. However, she maintains that she properly lobbied the General Assembly on behalf of one of her indigent clients.

#### 2. Georgia

The second incident crosses the border into Georgia. On November 6, 1995, Berkowitz, Weatherhead, and Dantzler, on behalf of SCLSA, PLS, and NLAP, respectively, traveled to Georgia at the request of the Georgia Commissioner of Insurance ("Georgia Commissioner"). The Georgia Commissioner was considering five separate license applications from RMC's Georgia subsidiary and sought information regarding RMC's business practices. Berkowitz, Weatherhead, and Dantzler all testified that RMC was not a reputable lending institution and that the Georgia Commissioner should deny RMC's requests. The Georgia Commissioner refused to grant RMC any licenses to do business in Georgia.

### B. RMC's Response

Convinced that Berkowitz, Weatherhead, and Dantzler had overstepped their bounds under the law, RMC filed an administrative complaint with LSC on February 1, 1996. RMC accused these individuals of violating federal rules regarding lobbying by LSC grant recipients. The following day, RMC, through their counsel, requested several items of information under the FOIA from LSC, including information regarding LSC's

---

1. In actuality, SCLSA operated as an arm of PLS in 1994 and 1995. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 6) (citing Berkowitz Dep. of 9/22/97, at 19.)

investigation of SCLSA, PLS and NLAP. While it produced many requested items, LSC told RMC that it would not provide any correspondence from the pending investigation, citing long-standing LSC policy. After exchanging several letters, on July 25, 1996, LSC sent RMC a final denial, refusing to provide any of the requested investigation materials. In this letter, LSC stated that the requested items were exempt from the FOIA under 5 U.S.C. § 552(b)(7)(A). Furthermore, LSC wrote that its investigation would be closed "within several weeks." (Mem. in Supp. of Pls.' Mot. for Summ. J. Ex. D, at. 1–2.)

Anticipating a quick decision by LSC, RMC did not immediately appeal this denial. After several weeks passed, with no conclusion to the investigation in sight, RMC filed an appeal of LSC's FOIA denial on October 21, 1996. RMC never received a response. On December 16, 1996, LSC issued its decision on RMC's administrative complaint, concluding that the lobbying at issue in both states did not violate federal guidelines. LSC then released the disputed FOIA documents to RMC on January 27, 1997. RMC filed the instant action on May 6, 1997.

### III. Discussion

The court runs square into the quagmire that has plagued this country's attempt to furnish legal assistance to the indigent. The dilemma involves the federal government's desire to fund indigent legal services while avoiding unwanted political activity. The plaintiff, RMC, charges that several LSC grant recipients overstepped their bounds and ventured into improper political activity with public funds. LSC, defending its review of these allegations, maintains that its grant recipients did no such thing. While their activity was political in nature, LSC declares that the activities of the local groups did not breach the federal legal services guidelines. In fact, LSC argues that RMC may not even challenge LSC's decision in this court. *See* (Def.'s Mem. in Supp. of Mot. for Summ. J. at 10–17.)

The court will first establish its authority over the issues and will then discuss the merits of the case.

### A. Jurisdiction of the Court

#### 1. History of LSC

In the early history of our country, private groups, funded by "private charities, municipalities, bar associations, and law schools," provided legal services to the poor. Paula Galowitz, *Restrictions on Lobbying by Legal Services Attorneys: Redefining Professional Norms and Obligations,* 4 B.U.Pub.Int.L.J. 39, 46 (1994). This continued until 1964, when the federal Office of Economic Opportunity commissioned a "task force to analyze the role of lawyers in the attack on poverty." *Id.* at 47; *see also* Warren E. George, *Development of the Legal Services Corporation,* 61 Cornell L.Rev. 681, 682 (1976). This commission led to the creation of an Office of Legal Services, designed to "give a full range of representation, including the advocacy of reforms in statutes, regulations, and administrative practices." Galowitz, *supra,* at 47. However, as the idea of legal services evolved, the organization quickly realized that to continue its public funding, it needed to distance itself from all things political.

This struggle to provide publicly-funded, non-political legal services to the poor would continue. In 1971, a Presidential advisory board combined with the American Bar Association to recommend the creation of a new corporation, separate from the Executive Branch, that would serve as an advocate for the nation's poor. *Id.* The result of this effort led to the creation of the Legal Services Corporation in 1974. In order to secure public funding for the new organization, its supporters had to concede certain restrictions on LSC's practices. As a result, Congress imposed several restrictions on the corporation to remove it from the political arena. LSC grant recipients can only lobby "if needed for 'legal advice and representation' for an eligible client." *Id.* (quoting 42 U.S.C. § 2996f(a)(5)(A) (1994)). In this same vein, grant recipients may testify before governmental bodies only upon request or if the pending action directly affects the activities of LSC. 42 U.S.C. § 2996f(a)(5)(B) (1994). Furthermore, LSC cannot appear in cases involving politically charged issues, such as selective service, school desegregation, or abortion rights. *See id.* at § 2996f(b).

These initial restrictions on LSC's advocacy remain. In fact, Congress has further, and more narrowly, defined LSC's mission several times since its creation, most recently in 1997. *See id.* at §§ 2996f(b)(9)–(11) (Supp. 1998) (reinforcing previous restrictions on political issues and adding restriction on cases involving assisted suicides). These constraints on LSC's advocacy have been the subject of much debate, though they remain in full effect today. *See. e,g.,* Jessica A. Roth, *It is Lawyers We are Funding: A Constitutional Challenge to the 1996 Restrictions to the Legal Services Corporation,* 33 Harv.C.R.–C.L.L.Rev. 107 (1998).[2] This tension in the law, the public funding of legal services without any unwarranted political advocacy, provides the basis for the case now before the court.

### 1. Basis of Jurisdiction

Consistent with its storied history, this court may review the decision of LSC. Congress chartered LSC as a corporation, not a department or an agency of the federal government. *See* 42 U.S.C. §§ 2996c(c) & 2996d(e) (1994); *see also Texas Rural Legal Aid, Inc. v. Legal Services Corp.,* 940 F.2d 685, 689 (D.C.Cir.1991). Accordingly, the court does not review LSC decision under the procedures found in the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* ("APA"). *Spokane County Legal Services, Inc. v. Legal Services Corp.,* 614 F.2d 662, 668–69 (9th Cir.1980) (APA does not apply to non-agencies). However,

> "although Congress clearly meant to insulate LSC from the vagaries of political pressure by making it an independent corporation rather than a federal agency, [there is] nothing in the Act or the legislative history to suggest that it meant to insulate LSC's actions from judicial review."

*Texas Rural Legal Aid,* 940 F.2d at 696–97. Therefore, the court derives its authority to review LSC decisions from pre-APA statutes and principles. *Id.* at 697.

### a. Pre–APA standard

 While the United States Court of Appeals for the Fourth Circuit has not ruled definitively on this matter, other circuit courts of appeal hold that LSC decisions "are subject to the pre-APA requirement that administrative decisions be rationally based...." *Id.* (citing, among others, *Spokane County Legal Services,* 614 F.2d at 669 & n. 11). Courts have often reasoned that this rational basis test is no different than the APA standards for agency review by the courts: that agency decisions be based on substantial evidence and not be arbitrary and capricious. *National Clients Council, Inc. v. Legal Services Corp.,* 617 F.Supp. 480, 485–86 (D.D.C.1985); *see also Texas Rural Legal Aid,* 940 F.2d at 697 (finding that pre-APA rational basis test is equivalent to the APA's arbitrary and capricious standard); *National Ctr. for Youth Law v. Legal Services Corp.,* 749 F.Supp. 1013, 1016 (N.D.Cal.1990) (holding that court may set aside LSC decisions that "are arbitrary and capricious or are not based on substantial evidence"). Therefore, this court will look to the APA standards for guidance, with the end view being "whether, considering all of the evidence introduced at the hearing, there was a rational basis for the decision rendered." *National Clients Council,* 617 F.Supp. at 485.

### b. Judicial review v. Private right of action

LSC argues that this is an improper view of this case's procedural posture. Rather than requesting an administrative review, LSC maintains that RMC is actually attempting to exercise a private right of action under the LSC Act. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 10.) Courts have consistently held that no private right of action exists under the Act. *See, e,g.,Grassley v.*

---

**2.** Local legal services organizations have also recently challenged these restrictions in court, questioning their legality under the Constitution. *See Velazquez v. Legal Services Corp.,* 985 F.Supp. 323 (E.D.N.Y.1997) (holding that ban on use of non-LSC funds for class actions violates First Amendment); *Legal Aid Soc'y v. Legal Services*

*Corp.,* 981 F.Supp. 1288 (D.Haw.1997) (finding that congressional restrictions on use of non-federal funds did not violate plaintiff's First Amendment, Due Process, or Equal Protection rights), *vacated in part on other grounds,* 145 F.3d 1017 (9th Cir.1998).

*Legal Services Corp.*, 535 F.Supp. 818, 825 (S.D.Iowa 1982) (detailing legislative history of the Act and determining that Congress did not intend to imply a private right of action). Furthermore, LSC cites to the Fourth Circuit's unpublished affirmation of an unpublished district court order that follows this proposed logic. *See Gent v. Legal Services Corp.*, No. 94–0086–A (W.D.Va. Sept. 21, 1994), *aff'd*, No. 94–2378, 1995 WL 110147 (4th Cir. Mar.16, 1995). Though these unpublished opinions carry no authoritative weight, *see* 4th Cir. Local R. 36(c), this is the only instance where the Fourth Circuit has touched on the issue currently before this court. Therefore, the *Gent* decision warrants some discussion. A close review of this opinion reveals that it has no authoritative weight.

In *Gent*, a local legal services organization refused to represent the plaintiff in a legal matter. The plaintiff, upset at the local group's decision, wrote LSC to request its intervention. After reviewing the case, LSC told the plaintiff that it agreed with the local organization's decision. *Gent*, No. 94–0086–A, slip op. at 2. The plaintiff then filed suit in federal court. The district court dismissed the plaintiff's complaint. The court reasoned that, because no private right of action existed under the LSC Act, the plaintiff could not maintain a suit against LSC. *Id.* at 5. Thus, the court concluded:

> The only remedy available to [the plaintiff] is to file a grievance procedure [with LSC] [The plaintiff] has already done this and the [local group's] decision not to represent [him] was upheld by LSC. There is nothing further that this Court can do....

*Id.* Though clearly and concisely stated, this trite reasoning is not persuasive.

■ The *Gent* court did not thoroughly analyze its ability to review LSC decisions. The court reasoned that "a client who feels that he has improperly been denied legal services may pursue an administrative client grievance procedure ..., but cannot sue in Federal Court." *Id.* (quoting *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 615 F.Supp. 916, 937 (D.C.Tex.1985)). This is true. However, it does not follow that an individual may not have an LSC decision reviewed by a federal court. As stated above, "[there is] nothing in the Act or the legislative history to suggest that it meant to insulate LSC's actions from judicial review." *Texas Rural Legal Aid*, 940 F.2d at 696–97. Therefore, while a federal court cannot entertain a direct attack against LSC, it can review an LSC decision following proper adjudication under LSC procedures.

In the case at bar, RMC could not have gone directly to federal court to pursue a private lawsuit against LSC and its local grant recipients for a first impression ruling. This is not what RMC has done. Instead of filing an action in federal court, RMC first pursued its claim through LSC grievance procedures. The absence of a private right of action does not forbid RMC from asking this court to now review that decision. The *Gent* court simply failed to make this distinction, and the Fourth Circuit issued a *per curiam* affirmance without any discussion.[3] As outlined above, a proper view of the Act governing LSC reveals that federal courts do have the authority to review LSC decisions.

#### 2. Standard of Review

RMC must show, as a matter of law, that LSC had no rational basis for its decision in this case. *Texas Rural Legal Aid*, 940 F.2d at 697. In reviewing the decision, the court looks to "all of the evidence." *National*

---

**3.** This court suspects that the *Gent* court failed to fully develop its authority over the LSC because of the litigant involved in that case. A review of recent opinions from the Fourth Circuit and the United States District Courts in Virginia shows that Jerry L. Gent is a frequent participant in the federal court system. *See Gent v. Smith*, No. 97–2016, 1997 WL 641667 (4th Cir. Oct.20, 1997); *Gent v. Department for Rights of Virginians With Disabilities*, No. 97–1254, 1997 WL 232529 (4th Cir. May 8, 1997); *Gent v. Central Virginia Legal Aid Soc., Inc.*, Nos. 95–3071 & 95–7857, 1996

WL 37310 (4th Cir. Jan.31, 1996); *Gent v. Radford Univ.*, 976 F.Supp. 391 (W.D.Va.), *aff'd*, 122 F.3d 1061 (4th Cir.1997); *Gent v. Gates*, No. 96–0155–A, 1997 WL 757878 (W.D.Va. Feb.12, 1997); *Gent v. Virginia Commonwealth Univ.*, No. 95–530, 1995 WL 758896 (E.D.Va. Oct. 4), *aff'd*, 72 F.3d 126 (4th Cir.1995); *Gent v. Gordon*, No. 94–75–A, 1995 WL 628396 (W.D.Va. Mar. 15), *aff'd*, 61 F.3d 899 (4th Cir.1995). Due to the litigious nature of the plaintiff, it is not implausible to believe that the *Gent* court did not devote its full attention to the issues presented.

*Clients Council, Inc.*, 617 F.Supp. at 485. In viewing this evidence, the court must determine only if LSC based its decision on logic and reason, not if the decision is completely without error. "The test is not whether an agency's reasons are correct, but whether they are rationally based." *Texas Rural Legal Aid v. Legal Services Corp.*, 783 F.Supp. 1426, 1428 (D.D.C.1992). Furthermore, "issues of law or procedure are properly questions for the [c]ourt to review *de novo.*" *National Clients Council, Inc.*, 617 F.Supp. at 485. Therefore, the court now turns to the substance of the instant action.

### B. LSC's Decision

The decision in question involves two areas of alleged wrongdoing: lobbying efforts before the South Carolina General Assembly and testimony before the Georgia Commissioner of Insurance. RMC further alleges that LSC did not fully investigate its complaint and failed to comply with reasonable, legal requests for information under the FOIA. The court will first analyze LSC's determination that no illegal activity took place in South Carolina or Georgia. It will then consider whether LSC erred in refusing to comply with RMC's FOIA requests.

### 1. Lobbying Efforts

#### a. South Carolina

■ LSC did not have a rational basis for determining that Berkowitz and, therefore, SCLSA and PLS, did not violate federal law when she testified before the General Assembly for the passage of Act 135. For the reasons and history detailed above, LSC's governing Act and LSC regulations severely restrict political lobbying by local legal services groups who receive LSC funds. LSC grant recipients may not seek to "influence the passage or defeat of any legislation by the Congress of the United States, or by any State or local legislative bodies . . . ." 42 U.S.C. § 2996f(a)(5) (1994); *see also* 45 C.F .R. §§ 1612.4(b), 1612.1(h)(1) (1993). In an exception to this general rule, local groups may conduct such lobbying where "representation by an employee of a [LSC grant] recipient for any eligible client is necessary to the provision of legal advice and representation with respect to such client's legal

rights and responsibilities[.]" 42 U.S.C. § 2996f(a)(5)(A) (1994); *see also* 45 C.F.R. § 1612.5(c) (1993). This requested lobbying must also address the "client's specific and distinct legal problems[.]" 45 C.F.R. § 1612.5(c) (1993). LSC failed to fully investigate RMC's charges to determine whether Berkowitz, SCLSA, and PLS had complied with these rules. The facts show that Berkowitz breached these guidelines.

LSC's cursory treatment of RMC's allegations did not provide a rational basis for its decision in regards to the South Carolina matter. In its decision, LSC reasons that: "Ms. Berkowitz properly advised the Executive Director that she had been retained by a client, whom she had not solicited, and appropriate relief entailed contacting the legislature." (Mem. in Supp. of Pls.' Mot. for Summ.J.Ex. A, at 4–5; hereinafter, "LSC Decision.") No further information is given about the client or the facts surrounding Berkowitz's lobbying efforts. The exacting language of the LSC guidelines demands a more thorough review. The rule applied by LSC states that a client must request lobbying by a legal services attorney for it to be proper. *Id.; see also* 45 C.F.R. § 1612.5(c) (1993). Furthermore, this client must also be "current" and "eligible." 45 C.F.R. § 1612.5(c) (1993). Finally, a legal services attorney who lobbies a legislature on behalf of a client may only address the client's "specific and distinct legal problems [.]" *Id.* With such precise language aimed at preventing most lobbying activity by groups receiving LSC funding, the details of this case demanded a more thorough treatment by LSC. A review of the facts before this court reveals violations of the LSC guidelines on several levels.

The alleged client at issue in the South Carolina matter did not ask Berkowitz to lobby the General Assembly and Berkowitz did not address the client's specific legal problems. Berkowitz claims that her lobbying before South Carolina's General Assembly was on behalf of Ms. Rosa Polite ("Polite"). (Mem. in Supp. of Pls.' Mot. for Summ.J. at 9) (citing several depositions given by Berkowitz.) Asked on several occasions whether she requested Berkowitz's

representation before South Carolina's legislature, Polite repeatedly answered, "No." (*Id.*) (citing Polite Dep. of 2/19/98 at 13–14.) Indeed, Berkowitz acknowledges she never spoke with Polite about her efforts to lobby the General Assembly on Polite's behalf. Instead, Berkowitz worked only through another legal services attorney, Martha Dicus. (*Id.*) (citing Berkowitz Dep. of 9/22/97 at 64.) Berkowitz also admits that she was not familiar with any of Polite's specific legal problems. (*Id.*) (citing Berkowitz Dep. of 9/22/97 at 67.) Therefore, under the precise wording of the LSC guidelines, it is evident that Polite did not ask Berkowitz, or anyone, to lobby the General Assembly for the passage of Act 135 on her behalf. Even if Polite had made such a request, Berkowitz failed to inform the General Assembly of Polite's specific legal problems.[4]

Furthermore, assuming that Polite had requested the lobbying for Act 135 and Berkowitz properly presented only Polite's specific legal problems, Polite was not a current client of SCLSA or PLS when the lobbying activity occurred. Polite retained a legal services attorney after being sued by RMC in early 1993 for an overdue loan from RMC. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 10.) According to RMC records, it charged off Polite's loan on June 30, 1993. (*Id .*) PLS documents show that it approved of Berkowitz's lobbying on Polite's behalf on November 1, 1993. (*Id.* Ex.L.) At this time, Polite was not a current client of PLS, SCLSA, or Berkowitz. Therefore, Berkowitz violated the LSC guidelines on several points: (1) her putative client did not ask her to lobby for the passage of Act 135; (2) she failed to address her client's specific legal problems; and (3) her alleged client was not using SCLSA or PLS's services at the time the lobbying occurred.

LSC made no mention of Polite in its Decision. *See* (LSC Decision, at 4–5.) This short history of Polite's case, combined with the stern language in the LSC guidelines, demanded a more thorough investigation of

this matter by LSC. Due to this failure to fully develop the factual record, LSC's decision that Berkowitz did not improperly lobby the General Assembly is without rational basis. Therefore, the court grants RMC's motion for summary judgment as to the South Carolina matter.

### b. Georgia

■ Unlike the South Carolina incident, a rational basis exists for LSC's decision that Berkowitz, Weatherhead, Dantzler, and their respective local legal services groups did not violate LSC guidelines when they testified before the Georgia Commissioner concerning RMC's application for a business license. Similar to the above ban, LSC grant recipients cannot normally appear before state administrative proceedings in an attempt to influence government decisions. 45 C.F.R. §§ 1612.1(b) & 1612.4(b) (1993). However, such administrative lobbying is permissible if the administrative agency "requests personnel of the recipient to testify . . . or to make representations to such agency[.]" 42 U.S.C. § 2996f(a)(5)(B)(i) (1994); *see also* 45 C.F.R. § 1612.6(a) (1993). LSC found that the testimony before the Georgia Commissioner was requested and, therefore, fell within this exception. (LSC Decision, at 2.) LSC's rationale for this portion of its decision is sound.

LSC based its decision in the Georgia matter on a precise rule, and it also provided sufficient factual support. As stated above, LSC fund recipients may testify before state agencies upon the request of the agency. 45 C.F.R. § 1612.6(a) (1993). In its decision, LSC found that the Georgia Commissioner had requested the testimony in question and, therefore, the testimony was permissible under the LSC guidelines. (LSC Decision, at 2–4.) LSC supported its decision with proper documentation, citing to the proper legal provisions, correspondence with RMC, and letters from the Georgia Commissioner. This provided LSC with a rational basis to determine that the testimony before the Georgia Commissioner was proper.

---

4. Incredibly, Berkowitz admits that she never even communicated with Polite about her lobbying efforts. (Pl.'s Mem. in Supp. of Mot. for Summ.J. at 12) (citing several Berkowitz depositions.) Lobbying a state legislative chamber as a legal services attorney on behalf of a client that has not been contacted clearly violates the spirit and the letter of the federal laws and LSC guidelines at issue in this case.

RMC does not dispute that the Georgia Commissioner did, in fact, ask Berkowitz, Weatherhead, and Dantzler to come and testify about their dealings with RMC. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 16.) Instead, RMC argues that these individuals violated another provision of the exception relied upon in the LSC Decision. (*Id.*) In addition to requiring that a governmental body request the administrative lobbying, legal services attorneys may testify only "to the extent compatible with meeting the demands for client service and priorities set by the recipient[.]" 45 C.F.R. § 1612.6(a) (1993). RMC asserts that the legal services attorneys in this case violated this clause because their testimony before the Georgia Commissioner deprived their South Carolina clients of time and resources and, therefore, was not compatible with client demands. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 16–17.) This reading of the requested testimony exception is much too broad.

In its decision, LSC gave a proper reading of the rule and supported its reasoning with facts, providing a rational basis for its determination. There are no facts before the court to suggest that the legal services attorneys in question endangered any clients by their testimony before the Georgia Commissioner. RMC would have this court believe that the legal services attorneys could not, at any time, both meet their clients' demands and also travel to a bordering state to provide requested testimony. Indeed, such testimony may have serviced many of their clients. However, that is not the determination this court is called to make. What this court must do is determine if LSC had a rational basis for determining that the testimony before the Georgia Commissioner was proper. The court finds that LSC did have such a basis and grants its motion for summary judgment as to the Georgia incident.

### 2. FOIA

■ RMC's claim under the FOIA is moot. LSC refused to produce several items of information to RMC. Though not a federal agency, LSC must comply with the provisions of the Freedom of Information Act ("FOIA"). 42 U.S.C. § 2996d(g) (1994). In an effort to prevent a government shielded from its people, the FOIA requires that federal agencies "upon any request for records ... make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A)–(B) (1996). This rule does not apply if producing the records "could reasonably be expected to interfere with [agency] enforcement proceedings[.]" *Id.* at § 552(b)(7)(A). The FOIA grants jurisdiction to the United States District Courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." *Id.* at § 552(a)(4)(B). Accordingly, "once an agency has produced the records sought, 'the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made.'" *Green v. National Archives & Records Admin.,* 992 F.Supp. 811, 817 (E.D.Va. 1998) (quoting *Crooker v. United States,* 628 F.2d 9, 10 (D.C.Cir.1980)). LSC ultimately produced the records in dispute and, therefore, rendered any FOIA claims moot.

RMC presented LSC with three separate FOIA requests for information surrounding RMC's complaint. LSC denied these requests, citing a "long maintained" policy of "not releasing correspondence during the course of a review" and stating that production of the requested items would impede its investigation of the complaint filed by RMC. (Mem. in Supp. of Pls.' Mot. for Summ.J.Ex. C, at tab 3, p. 1.) RMC appealed this denial, though LSC took no action. At the conclusion of its investigation, LSC produced the requested information to RMC. RMC acknowledges that, "[i]f all that [RMC] sought was to obtain certain records, and those records had been released, then the issue might be moot." (Pls.' Resp. to Def.'s Mot. for Summ.J. at 19.) However, RMC challenges LSC's policy that prevented the release of information in the instant case.

LSC's production of the disputed documents moots the current controversy and prevents any further review. In an exception to the normal rule that the production of documents moots any FOIA claim, some circuit courts of appeal allow supposedly mooted FOIA claims to continue if there exists a "policy or practice of delayed disclosure or some other failure to abide by the terms of

the FOIA[.]" *Payne Enterprises, Inc. v. United States,* 837 F.2d 486, 491 (D.C.Cir. 1988). The claimant proceeds in an action for declaratory relief, asking the court to declare the agency's policy as violative of the FOIA and, thereby, prevent any future abuses. *See Houston v. HUD,* 24 F.3d 1421, 1429 (D.C.Cir.1994) (discussing the nature of FOIA claim against an agency policy). In seeking a declaration from this court, RMC must show that its "risk of injury is 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1429 n. 6 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). RMC fails to make such a showing.

The initial delay RMC suffered as a result of LSC's policy is but one instance.[5] This isolated event " 'does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Id.* (quoting *Lujan,* 504 U.S. at 556, 112 S.Ct. 2130). RMC has presented no evidence that it has further FOIA requests pending with LSC or that it intends to file further requests. RMC now possesses all of the pertinent, disputed materials in this case. Therefore, no case or controversy exists for this court to decide.

### IV. CONCLUSION

This case involves serious allegations that cut to the heart of the continuing controversy over the public funding of legal services for the poor. While Congress has made a public policy decision to provide such a service, it did so with certain conditions. Legal services attorneys are severely restricted in what they can do on behalf of their clients, especially when the activity concerns the political arena. In the instant case, these restrictions were violated. Berkowitz's lobbying of the South Carolina General Assembly transgressed the clear language of federal law and LSC guidelines. There was no rational basis to decide otherwise. However, in regard to the testimony given before the Georgia Commissioner of Insurance, the law and facts support the LSC Decision. The legal services attorneys were clearly acting upon the request of a governmental body and their testimony did not violate any duties to their South Carolina clients. Finally, though the LSC policy on producing information may be suspect, the FOIA question before this court is moot. RMC has received all of the disputed information and has no standing to challenge LSC's actions.

For the foregoing reasons, it is

**ORDERED** that RMC's motion for summary judgment is granted as to the South Carolina incident. The court denies the remainder of RMC's motion. It is further

**ORDERED** that LSC's motion for summary judgment is granted as to the Georgia incident. The court denies the remainder of LSC's motion. It is further

**ORDERED** that RMC's challenge under the FOIA is denied. It is further

**ORDERED** that the LSC Decision is remanded to LSC and LSC is instructed to fashion a proper remedy in accordance with this order.

**IT IS SO ORDERED.**

---

5. Though the claim before the court is moot, the court is skeptical of the legality of LSC's stated policy of denying all FOIA requests during pending investigations. As noted above, LSC bases its policy on the "interference" exception found in the language of the FOIA. 5 U.S.C. § 552(b)(7)(A). The United States Court of Appeals for the Fourth Circuit has held that this exception does not apply where the request "does not come from a party facing an enforcement proceeding to which the investigative material is germane." *Wellford v. Hardin,* 444 F.2d 21, 24 (4th Cir.1971). LSC admits that this was the first request it handled from a complainant during a pending investigation. (Pls.' Mem. in Supp. of Mot. for Summ.J.Ex. C, at tab 3, p. 1.) LSC apparently applied a rule that is normally reserved for information flowing to parties under investigation. This rule is not applicable in the instant case. Since the instant claim is moot, the court reserves judgment on the legality of the LSC policy. However, it is not likely that the policy would withstand judicial scrutiny under the FOIA.